WILLIAM HEBERT & another[1] *vs.* CARL ENOS.

No. 02-P-1379.

Middlesex. December 4, 2003. - April 15, 2004.

Present: LENK, KAFKER, & MILLS, JJ.

*Negligence,* Causation, Foreseeability of harm.

In a civil action to recover for personal injuries that the plaintiff suffered as a
result of receiving a severe electric shock while lawfully on the defendant's
property, which shock was the result of the defendant's faulty repairs to a
toilet, causing flooding that reacted with the home's electrical system to
create an electrical current that shocked the plaintiff when he touched an
outside faucet, the judge properly granted summary judgment in favor of
the defendant, where the harm that the plaintiff suffered was so highly
extraordinary that the defendant could not be required to guard against it.
[820-822]

CIVIL ACTION commenced in the Superior Court Department on
November 20, 2000.

The case was heard by *Diane M. Kottmyer,* J., on a motion
for summary judgment.

*F. Joseph Gentili* (*Theresa K. Capobianco* with him) for the
plaintiffs.

*Paul J. Gillespie* for the defendant.

KAFKER, J. The plaintiff William Hebert (Hebert) brought an
action to recover for personal injuries he suffered as a result of
receiving a severe electric shock while lawfully on the defendant
Carl Enos's property to water the defendant's flowers. Hebert
claimed that the defendant's faulty repairs of a second-floor
toilet caused the toilet to overflow. The flooding water then
reacted with the home's electrical system, creating an electrical
current that shocked and injured Hebert when he touched the
outside water faucet. Hebert asserted a claim for negligence in

[1] Linda Hebert.

his complaint, and his wife sought damages for loss of consortium. The defendant moved for summary judgment on the ground that Hebert's injuries were not a reasonably foreseeable consequence of any negligence on the defendant's part. The judge allowed the defendant's motion for summary judgment, finding that "[t]he injury to [Hebert] was highly extraordinary and 'so remote in everyday life' as to preclude a finding that the alleged negligence was a legal cause of [Hebert's] injuries." We affirm.

*Background.* The facts and reasonable inferences therefrom, viewed in the light most favorable to the plaintiffs, are as follows. The defendant and the plaintiffs were neighbors in Framingham. The defendant, prior to departing on vacation, asked Hebert to water his flowers while he was away. Hebert agreed and watered the defendant's flowers without incident on the three days leading up to July 4, 2000.

On July 4, 2000, Hebert, while holding the defendant's garden hose in one hand, reached for the outside faucet on the defendant's house. Apparently, upon grabbing the faucet, Hebert received an electric shock that threw him many feet through the air, melted his sneakers and glasses, set his pants on fire, and knocked his dental plate from his mouth. Hebert suffered serious injuries, including burns and exit wounds on his body and damage to his mouth.

The Framingham fire department responded to the scene and observed water in the basement of the defendant's house. The source of the water was determined to be the second-floor toilet. The fire department shut off the flow of water to the toilet and shut down the main electrical breaker. Edward Hicks, the electrical inspector for the town of Framingham, inspected the basement and the components of the electrical system, and "didn't see anything abnormal." In his deposition, Hicks stated that there was water in the basement, "in spots there was a couple inches." He observed that "[w]ater was coming out of the light fixture upstairs in the dining room," but opined that "it wouldn't cause that much voltage to do the damage that was done to Mr. Hebert." The next day, Hicks "[t]ook a closer look and double checked everything that [he had] checked the day before and . . . couldn't really determine what was the cause" of Hebert's accident.

In their opposition to the defendant's motion for summary judgment, the plaintiffs provided an expert's report prepared by a professional engineer. It was the expert's opinion that "in the several days the water was flowing through the house, the water caused good [or already deteriorated] insulation on wires to break down allowing leakage current to flow into a grounded surface and thence through the water piping system."

When Hebert "came into contact with the water piping system (i.e. the turn-on handle)," he became "part of the electric circuit." Because Hebert was wet from perspiration and from having watered his own flowers, the amount of electricity that would have flowed through him was much greater than it would have been had he been dry. The expert opined to a "reasonable degree of engineering certainty" that the electrical current flowing through Hebert's body and causing his injury was "a direct result of the water overflow and accompanying flooded condition of the house."

The defendant hired a plumber to repair his toilet on July 11, 2000. The plumber provided deposition testimony indicating that he "replaced the ball cock which is the fill valve for the toilet." When making the repair, he observed a plastic component of the ball cock assembly, out of place, at the bottom of the toilet tank. The plumber stated that with the plastic piece out of place, "you would probably have a flood."[2] Although having no knowledge as to how the piece ended up at the bottom of the tank, he suggested that the plastic part was a "cheap valve . . . a Home Depot, homeowner, I-can-fix-it-myself type deal." The plumber acknowledged, however, that although he would prefer to use brass hardware, the plastic component "is a type of item that a plumber likes to use. It is a common item." The prior owner of the house also testified that

---

[2]The ball cock assembly, which extends upward from the bottom of the toilet tank, is under constant pressure. If it were to fail, water would flow into the tank unregulated, and eventually overflow the tank. The plumber explained that the ball cock is "the fill valve. That's what tells the tank to put more water into it when it's flushed. Water comes out, the ball goes down . . . [w]hen the ball comes back up, water level is high enough, shuts it off." The plastic component that failed in this case was not the plastic float ball that rises and falls with the water level. Rather, the plastic component "should have been screwed" or snapped on to the "[t]op of the ball cock." With the piece missing, "water would just shoot out [of the fill valve] like a fountain."

when he owned the property, the "main guts" inside the tank of the toilet were metal except for a plastic or rubberized ball.

Hebert observed the toilet before it was repaired on July 11. In his deposition, he stated, "When I saw it, . . . [t]he whole top of the plastic unit was blown off and all on the bottom of the toilet." Hebert asserted that the water pressure "blew the top right off." Contrary to the testimony of the plumber, Hebert asserted, "No plumber in his right mind would ever install it . . . you don't put a six dollar part in a toilet."

The defendant testified about the operation of his toilet prior to the July 4 accident. He stated that he did not make any repairs to the toilet.[3] This testimony is contradicted by Hebert, who claimed to have observed the defendant repairing the second-floor toilet prior to July 1, 2000. For summary judgment purposes, we credit Hebert's testimony.

*Discussion.* When the facts and reasonable inferences therefrom are viewed in the light most favorable to the plaintiffs, we conclude that the plaintiffs submitted sufficient evidence to establish that faulty repairs of the toilet by the defendant resulted in flooding and severe electric shock to Hebert when he touched the faucet.[4] Summary judgment is still appropriate, however, if a plaintiff has no reasonable expectation of proving that "the

---

[3]The defendant only indicated that he "jiggled the handle" on the upstairs toilet "maybe twice" prior to July, 2000. The plumber testified that jiggling the handle "helps the flapper sit flush on the flush valve . . . . Then the water in the tank will start filling because you are not losing water through the flush valve." He indicated the only reason to jiggle the handle is to resolve a problem with the flapper. The flapper is not a part of the ball cock, and a problem with the flapper would not cause water to overflow the toilet tank.

[4]We recognize that the Superior Court judge assumed, without deciding, the existence of "but for" causation, stating: "The evidence as to a causal relationship between the negligent repair allegedly performed by Enos and the failure of the ball cock would be sufficient *only in the event* that Hebert, a licensed contractor, qualified as an expert and was permitted to give opinion testimony. The evidence as to a causal relationship rests on testimony by Hebert as to (1) his observations of Enos repairing the toilet some time before the accident; (2) his observations of the condition of the toilet after the accident (the fluid master had been installed improperly); and (3) conclusions that he drew as to the mechanism of failure based on his observation of the toilet after the accident (the improper configuration of the fluid master caused the ball cock to fail). There is no other evidence as to the causal relationship between the two." (Emphasis added.) We note, however, that Hebert's testimony is supported and in part duplicated by the plumber's testimony regarding the flood-

injury to the plaintiff was a foreseeable result of the defendant's negligent conduct."[5] *Kent* v. *Commonwealth*, 437 Mass. 312, 320 (2002). See *Bergendahl* v. *Massachusetts Elec. Co.*, 45 Mass. App. Ct. 715, 725 (1998), cert. denied, 528 U.S. 929 (1999) ("While the issue of foreseeability is ordinarily a question of fact for the jury, the court may decide the issue as a matter of law . . . in the absence of evidence that the risk which resulted in the plaintiff's injury should reasonably have been anticipated by the defendant . . ." [citation omitted]); *Palsgraf* v. *Long Island R.R.*, 248 N.Y. 339, 345 (1928) ("The range of reasonable apprehension is at times a question for the court, and at times, if varying inferences are possible, a question for the jury").

We say that "[o]ne is bound to anticipate and provide against what usually happens and what is likely to happen, but is not bound in like manner to guard against what is . . . only remotely and slightly probable." *Falk* v. *Finkelman*, 268 Mass. 524, 527 (1929). See Restatement (Second) of Torts, § 435(2) (1965) ("The actor's conduct may be held not to be a legal cause of harm to another where . . . it appears to the court highly extraordinary that it should have brought about the harm"). We look to determine whether the "general character and probability of the injury [were] foreseeable." *Glick* v. *Prince Italian Foods of Saugus, Inc.*, 25 Mass. App. Ct. 901, 902 (1987). See *Andrews* v. *Jordan Marsh Co.*, 283 Mass. 158, 161 (1933). We also recognize that "[t]here must be limits to the scope or definition of reasonable foreseeability based on considerations of policy and pragmatic judgment." *Poskus* v.

---

ing being caused by the out of place, "Home Depot, homeowner, I-can-fix-it-myself type" of "cheap valve," as well as the former homeowner's testimony that the parts inside the toilet were metal, not plastic, when he sold the house to the defendant. See note 2, *supra*, for a description of the ball cock assembly.

[5]We note that where the issue is "reasonable foreseeability, the distinction between duty and proximate causation is not critical," and we do not therefore address the two issues separately. *Cimino* v. *Milford Keg, Inc.*, 385 Mass. 323, 328 n.6 (1982). See *Whittaker* v. *Saraceno*, 418 Mass. 196, 198-199 (1994) ("As a practical matter, in deciding the foreseeability question, it seems not important whether [we] define[] a duty as limited to guarding against reasonably foreseeable risk of harm or whether [we] define[] the necessary causal connection between a breach of duty and some harm as one in which the harm was a reasonably foreseeable consequence of the breach of a duty").

*Lombardo's of Randolph, Inc.*, 423 Mass. 637, 640 (1996). See, e.g., *Griffiths* v. *Campbell*, 425 Mass. 31, 35-36 (1997); *Coughlin* v. *Titus & Bean Graphics, Inc.*, 54 Mass. App. Ct. 633, 641 (2002).

In the instant case, when we consider the likelihood, character,[6] and location of the harm, we conclude as matter of law that the injuries sustained by Hebert were a "highly extraordinary" consequence of a defective second-floor toilet. See Restatement (Second) of Torts § 435(2). See also *Rae* v. *Air Speed Inc.*, 386 Mass. 187, 193 (1982); *Bergendahl* v. *Massachusetts Elec. Co.*, 45 Mass. App. Ct. at 725. Although we can envision a variety of foreseeable injuries arising out of a defective toilet,[7] the electric shock to a neighbor when he touches a faucet outside the house is well beyond the "range of reasonable apprehension" and therefore not foreseeable. *Palsgraf* v. *Long Island R.R.*, 248 N.Y. at 345. See *Polak* v. *Whitney*, 21 Mass. App. Ct. 349, 351 (1985) (duty to warn guests extends to "any unreasonable dangers of which [the homeowner] was aware or should reasonably have been aware"). We therefore conclude that Hebert's severe and unfortunate injuries were the consequence of the type of unforeseeable accident for which we do not hold the defendant responsible in tort. The harm Hebert suffered, even when the facts and reasonable inferences that could be drawn therefrom are viewed in the light most favorable to him, was so highly extraordinary that the defendant cannot be required to guard against it.

---

[6]The Massachusetts Superior Court Civil Jury Instructions § 2.1.8 (MCLE 1998), relying on the Restatement (Second) of Torts § 435 comments a & b and *Rae* v. *Air Speed Inc.*, 386 Mass. 187, 193 (1982), focus on whether the defendant should have "realized that [his or her] conduct might cause harm . . . *in substantially the manner* in which it is brought about" (emphasis added). Restatement (Second) of Torts, § 435 comment b. Similarly, Judge Friendly, in *Petition of Kinsman Transit Co.*, 338 F.2d 708, 724 (2d Cir. 1964), cert. denied sub nom. *Continental Grain Co.* v. *Buffalo*, 380 U.S. 944 (1965), referred to foreseeable damages as being limited to "the same general sort that was risked." Here, the risk was water damage from the flooding toilet, and the harm was a severe electric shock.

[7]For example, a guest's slip and fall within a house or water damage to another unit in an apartment complex might be foreseeable. See, e.g., *Great Atlantic & Pacific Tea Co.* v. *Yanofsky*, 380 Mass. 326, 333 (1980) (reasonably foreseeable for leaky roof in grocery store to lead to slip and fall by customers).

We briefly touch upon various subsidiary arguments raised by the plaintiffs. The plaintiffs argue that water and electricity have distinct places in the law, and that the motion judge should have recognized the foreseeability of the risk of injury due to the mixture of electricity and water "as a matter of common sense." *Great Atlantic & Pacific Tea Co.* v. *Yanofsky*, 380 Mass. 326, 333 (1980).[8] We conclude that the motion judge held the defendant to the "proper standard of care [which] is . . . the usual one of traditional negligence theory: 'to exercise care that was reasonable in the circumstances.' " *Bergendahl* v. *Massachusetts Elec. Co.*, 45 Mass. App. Ct. at 724-725, quoting from *Clough* v. *New England Tel. & Tel. Co.*, 342 Mass. 31, 35 (1961).

Finally, the plaintiffs appear to suggest that so long as the defendant's negligence can be connected in an unbroken causal chain to the resultant harm, and no third party's negligence can be blamed for the injury, the harm is by definition proximate.[9] This is not the law of proximate cause in Massachusetts, nor is it supported by the commentary upon which the plaintiffs rely.[10] Here, the defendant could not have reasonably foreseen the harm that befell Hebert.

*Judgment affirmed.*

---

[8]For the reasons stated in note 7, *supra*, *Great Atlantic & Pacific Tea Co.*, *supra*, does not support the plaintiffs' proposition that Hebert's injury was foreseeable as a matter of common sense.

[9]They refer to this formulation as the "direct consequences" principle.

[10]Prosser and Keeton define direct consequences as "those which follow in sequence from the effect of the defendant's act upon conditions existing and forces already in operation at the time, without the intervention of any external forces." Prosser & Keeton, Torts § 43, at 294 (5th ed. 1984). Because direct consequences "may still be fantastic . . . it is not likely that any court would ever carry the direct liability to all of the extreme lengths to which it might lead." *Id.* at 295. See, e.g., *Matteo* v. *Livingstone*, 40 Mass. App. Ct. 658, 661-662 (1996), quoting from *Petition of Kinsman Transit Co.*, 338 F.2d at 723 (stating that "everything is not foreseeable 'that has in fact occurred' "). We think that the consequences of the defendant's faulty repair are sufficiently extraordinary to preclude liability in this case as matter of law.