## COMMONWEALTH VS. ANGELO TODESCA CORPORATION.

No. 03-P-431.

Barnstable. June 14, 2004. - December 1, 2004.

Present: CYPHER, SMITH, & DOERFER, JJ.

Further appellate review granted, 443 Mass. 1105 (2005).

*Homicide. Motor Vehicle,* Homicide.

Evidence at a criminal trial was insufficient to support the conviction of the defendant, a subcontractor involved in a road improvement project, of motor vehicle homicide, G. L. c. 90, § 24G[b], for its employee's action in having backed up a truck, striking and killing a police officer who was responsible for ensuring the safe passage of traffic through the work zone, where the Commonwealth failed to establish beyond a reasonable doubt that defendant, either through its maintenance of the truck or through its employee, breached its duty of care, and where the defendant's failure to install a functioning back-up alarm on the truck that struck the officer was not a proximate cause of his death. [604-609]

INDICTMENT found and returned in the Superior Court Department on April 9, 2002.

The case was tried before *Richard F. Connon,* J.

*Jeffrey T. Karp* for the defendant.

*Michael D. O'Keefe,* District Attorney, & *Julia K. Holler,* Assistant District Attorney, for the Commonwealth, submitted a brief.

CYPHER, J. After a jury trial in Superior Court, the defendant, Angelo Todesca Corporation, was found guilty of motor vehicle homicide (G. L. c. 90, § 24G[*b*]) and acquitted of involuntary manslaughter (G. L. c. 265, § 13). The charges arose from a motor vehicle accident in which a police officer, working a paid detail, was struck by a dump truck owned by the defendant. The defendant claims that the evidence was insufficient to support the conviction. We agree.

1. *Facts.* Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following

facts. In late 2000, the defendant was a subcontractor involved in a road widening and improvement project underway on Route 28 in Hyannis and Centerville. The defendant's trucks were used to haul asphalt to the construction site. Brian Gauthier was a truck driver for the defendant.

On December 1, 2000, an approximately one-mile section of Route 28 was scheduled to be repaved. Gauthier was assigned to deliver asphalt to the site in a tri-axle truck identified as AT56, a truck that Gauthier had been operating for about a year. The highway at this location consisted of four lanes, two eastbound and two westbound, and included the intersection of Route 28 with the main entrance to the Bell Tower Mall (mall).

In order to safely accomplish the work and to provide access to the mall during the road construction, several traffic lanes had to be closed and traffic rerouted. To implement these measures, the Massachusetts highway department's civil engineer on the project, Thomas Ockerboom, scheduled an early morning meeting in the mall parking lot with the general contractor, Pavo, as well as with the police officers Ockerboom had requested for the day.[1]

Brad Erickson, the victim, was the first police officer to arrive on the project, between 5:30 A.M. and 6:00 A.M. Erickson requested to be part of the paving operation as opposed to being stationed on the detour route. Ockerboom complied with Erickson's request and assigned him to the front of the mall. Because the mall was going to be open for business that day, Erickson was responsible for directing traffic safely across the construction zone, into and out of the mall.

As part of his job for the defendant, Gauthier was required to conduct a "circle check" of the vehicle he would be driving

---

[1]At around 5:30 A.M., Pavo's employees began closing down three lanes of traffic on Route 28, the two westbound lanes where the work was to be performed and the eastbound lane closest to them as a safety buffer. The cones were placed about fifty feet apart in the more northerly eastbound lane over the entire length of the project. Detour signs were also put in place along the alternate route set out for the westbound traffic. No cones were positioned along a pathway between the entrance to the mall and the single lane of eastbound traffic that remained open. Several cones were, however, placed along the sides of that pathway to block traffic from those areas that were closed for paving.

each morning before beginning work. The purpose of the circle check was to assess whether there were any safety or mechanical problems with the truck. The result of that inspection had to be noted on a preprinted form required by the United States Department of Transportation (DOT) and submitted to the defendant (circle report). Gauthier conducted such a check that morning and noted, among other problems that are not relevant to this appeal, that he did not have a back-up alarm.[2]

By approximately 2:30 P.M., Gauthier had arrived at the site with his third load of asphalt for the day. David Edwards, who was also hauling asphalt to the repaving site for the defendant, followed Gauthier from the asphalt plant to the work area. Gauthier parked his truck west of the entrance to the mall about one foot from the curb. Edwards pulled his truck in front of Gauthier's and parked about fifteen feet from the curb.

Directly east of the mall entrance but parked on the same side of the road, roughly parallel with Edwards's truck and Gauthier's truck, were three more vehicles involved in the paving project. Closest to the mall entrance on the east side was Joseph McGonagle's truck, behind him was Daniel Vigue's truck, and last in the row was Russell Lowe's truck.

After Gauthier and Edwards had parked their trucks, they got out and joined the other drivers and Erickson, who were congregated just east of the entrance to the mall, in one of the closed westbound lanes, near Vigue's truck. In addition to casual conversation, Edwards and Gauthier were informed that they were going to have to back their trucks around the other three trucks, on the other side of the mall entrance. Because this would require both drivers to back across the mall entrance, Edwards asked Erickson, "Will you watch our back as we're back-

[2]Sometime between one week and two months earlier, Gauthier had noticed that the back-up alarm was missing from the rear of his truck and had so informed the defendant's mechanics. Gauthier noted it on his circle reports. There was evidence that Gauthier had agreed to pick up the part and install it himself. There was other evidence, however, that the mechanics, namely Walter Ritchie and Benjamin Romano, were awaiting the delivery of an alarm that was back-ordered in order to make the repair. In any event, it is undisputed that the alarm had not been replaced before Gauthier arrived at the paving job on December 1, 2000, nor is it disputed that Gauthier had previously reported the problem to the defendant.

ing through the intersection?" Erickson responded, "Yes," and nodded his head. For his part, Gauthier told Erickson that he would be going next to the paver and pointed to his truck. Once the order in which the trucks would unload was established, the group dispersed and the drivers went to their trucks.

Before beginning to back up, Gauthier visually checked for Erickson. Erickson appeared to Gauthier to be far enough from his path that he believed he could back up "without having a problem." Erickson was near the mall entrance and the center line of the road. Gauthier rolled down his driver's side window, turned off the radio, turned off his citizens band radio, and put his truck in a reverse gear that allowed him to back up as slowly as possible. He began to move his truck backwards. Edwards estimated that approximately fifteen to twenty seconds had passed between his having asked Erickson to watch their "backs" and Gauthier starting to back his truck.

Edwards started to back up as soon as he saw Gauthier's truck begin to move in reverse. Because he was closer to the center line, he kept a lookout in his driver's side mirror. As he expected, Gauthier, whose truck was closer to the curb, was looking primarily in his passenger's side mirror in order to angle his truck around the other trucks parked behind him, to get to the paver.[3] Edwards was traveling at about two miles per hour and was keeping an even distance between his truck and Gauthier's, approximately forty-five to fifty feet. Gauthier was backing up at the same rate of speed, about two to three miles per hour.[4] While Edwards was backing up, he lost sight of Erickson and repositioned his truck so that he could see him. He noticed that Erickson was standing behind Gauthier's truck. Although the back-up alarm on Edwards's truck was functioning and could be heard as he traveled in reverse, he began to blow his air horn because of Erickson's close proximity to Gauthier's truck.

At about the same time, several other witnesses saw Erick-

---

[3]Edwards also expected that Gauthier would rely on him to keep a lookout on Gauthier's driver's side, because Edwards was closer to that side of the road and had a better angle to see behind Gauthier's truck.

[4]Gauthier was moving so slowly that at one point, he was able to stop in time to avoid hitting a car that had cut behind him as he neared the mall entrance.

son's precarious position. Lowe saw Erickson walking from the center of the road at an angle toward his truck, which was about sixty to one hundred feet behind Gauthier's truck. Erickson was walking away from Gauthier's truck, with his back to it. At the same time, Gauthier was beginning to angle his truck slightly toward the center of the road, to avoid the trucks parked on the side of the road. Erickson was looking down and focusing on something in his hands.

When Lowe saw that Gauthier's truck was within about five feet or so of Erickson, Lowe began to sound his air horn. Lowe testified that his air horn was "significantly louder" than a back-up alarm. Vigue was standing on the side of Lowe's truck when Lowe first sounded his air horn. Vigue turned around and saw Erickson walking with his back to Gauthier's backing truck. Erickson was near the center of the rear of the truck. Vigue ran toward Gauthier's truck, trying to stay in view of the passenger's side mirror of Gauthier's truck to get Gauthier's attention.[5] Vigue testified that he was at least eighty feet away from the rear of Gauthier's truck when he started to run toward it. Vigue yelled at Gauthier to stop and waved his closed fist, which is a signal to stop recognized by truck drivers.

When Edwards saw Vigue running toward the rear of Gauthier's truck, Edwards jumped out of his vehicle and ran toward the front of Gauthier's truck. Edwards was trying to make eye contact with Gauthier, but could not see him until he was very close to Gauthier's truck cab.

Erickson was unresponsive to any of these warnings. He only reacted when the center of the rear of Gauthier's truck made contact with him. The point of contact was "[t]otally in [Gauthier's] blind spot." Erickson was knocked down on his hands and knees and he began to scramble diagonally "along the ground to get away from the truck." He got his torso clear, but the rear wheels of the truck ran over his legs before Gauthier knew what had happened.

When Gauthier reached the other side of the intersection, he heard the air "horns go off" and testified that "[he] looked out

---

[5]Because there were only cones to Gauthier's left, Vigue presumed Gauthier would be more concerned with keeping on eye on his passenger's side mirror, so that he could see and avoid hitting the vehicles parked to the right.

[his] passenger side mirror thinking that maybe [he] clipped the mirror on the truck or something. [He] didn't see anything. [He] looked at [his] driver's side mirror, and then [he] realized where [Erickson] was." Gauthier immediately stopped the truck and pulled forward, moving the truck off Erickson.[6]

Gauthier got out of his truck and went to Erickson and held his hand until a State trooper arrived at the scene. Gauthier estimated that about five minutes had passed since he had pointed out his truck to Erickson and told him that he would be backing up next.

Despite having been very seriously injured, Erickson, by all accounts, was alert and able to talk to those who were at the scene, as well as to the emergency medical personnel who assessed his condition and transported him to the hospital in an ambulance. In response to the only question Barnstable police Sergeant Steven McGuire asked, Erickson said that he was facing "[i]n the opposite direction."[7] On the way to the hospital, Erickson told the paramedic who was in the ambulance on the way to the hospital that "he [Erickson] had really screwed up." The accident happened at about 3:00 P.M., and Erickson succumbed to his injuries and died that evening at about 11:30 P.M.

Subsequent inspections of Gauthier's truck revealed no regulatory violations or other abnormalities that may have contributed to the accident, with the single exception of a missing back-up alarm. The judge instructed the jury that neither the Commonwealth nor the DOT requires a truck such as the one Gauthier was driving to have a back-up alarm.[8]

2. *Sufficiency of the evidence.* Because the defendant is a

---

[6]Two other people happened to be in the area at the time and witnessed the accident. Their testimony was similar in all material respects to that offered by the truck drivers who saw the events unfold.

[7]McGuire assumed that Erickson's injuries were not life threatening and postponed further questioning until Erickson was at the hospital.

[8]Title 29 C.F.R. § 1926.601, a regulation promulgated by the Occupational Safety and Health Administration, contains such a requirement, but the requirement only applies to "vehicles that operate within an off-highway job site, not open to public traffic." The pertinent portion of that regulation reads as follows:    ·

"No employer shall use any motor vehicle equipment having an obstructed view to the rear unless: (i) The vehicle has a reverse signal

corporation, and not a live person, it can act only through its agents. *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. 737, 742-743 (1987). To prove that a corporation is guilty of a criminal offense, the Commonwealth must prove the following three elements beyond a reasonable doubt: (1) that an individual committed a criminal offense; (2) that at the time of committing the offense, the individual "was engaged in some particular corporate business or project"; and (3) that the individual had been vested by the corporation with the authority to act for it, and on its behalf, in carrying out that particular corporate business or project when the offense occurred. See Model Jury Instructions for Use in the District Court § 5.07 (1995); *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. at 744.

In order to establish corporate criminal liability, therefore, the Commonwealth must first prove that an individual committed the crime charged, namely vehicular homicide.[9] The statute setting forth the elements of vehicular homicide, G. L. c. 90, § 24G, requires the Commonwealth to prove "(1) operation of a motor vehicle, (2) upon a public way, (3) recklessly or negligently so as to endanger human life or safety, (4) thereby causing the death of a person." *Commonwealth* v. *Burke*, 6 Mass. App. Ct. 697, 699 (1978). In this case, there was no dispute that Gauthier was operating the vehicle in question nor

alarm audible above the surrounding noise level or: (ii) The vehicle is backed up only when an observer signals that it is safe to do so."

The parties did not introduce or refer to this regulation. The regulation appears only to require an observer to signal once that it is safe to back up, and does not require a continuous signal throughout the maneuver.

[9]Gauthier testified that he "admitted to sufficient facts" on the charges of vehicular homicide and failure to use due care in backing up. The complaint was continued without a finding and Gauthier was placed on probation for three years. Gauthier's admission does not relieve the Commonwealth of proving each element of the charge beyond a reasonable doubt. Cf. *Wardell* v. *Director of the Div. of Employment Security*, 397 Mass. 433, 436-437 (1986) ("An admission to sufficient facts, absent a subsequent finding of guilt, does not constitute substantial evidence from which a finder of fact in a collateral civil proceeding can determine that the alleged misconduct has indeed occurred"); *Santos* v. *Director of the Div. of Employment Security*, 398 Mass. 471, 473 (1986); *Burns* v. *Commonwealth*, 430 Mass. 444, 450-451 (1999) (police officer's admission to sufficient facts and the resulting continuance without a finding was not conclusive proof that officer was guilty of charged conduct in disciplinary proceeding based on same events).

was there any dispute that Erickson had died as a result of being struck by that vehicle. Rather, the focus at trial was on the question whether Gauthier was negligent and, secondarily, whether the incident occurred on a public way.

In the circumstances of G. L. c. 90, § 24G, negligence is determined by the same standard that is employed in tort law.[10] See *Commonwealth* v. *Berggren*, 398 Mass. 338, 340 (1986); *Aucella* v. *Commonwealth*, 406 Mass. 415, 418-419 (1990); *Commonwealth* v. *Geisler*, 14 Mass. App. Ct. 268, 276 (1982). In any negligence cause of action, there are four elements that must be established by the plaintiff, who in this case is the Commonwealth, in order to prevail. The Commonwealth "must show: (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury." *Jorgensen* v. *Massachusetts Port Authy.*, 905 F.2d 515, 522 (1st Cir. 1990). See Prosser & Keeton, Torts § 30 (5th ed. 1984).

Generally speaking, a legal duty encompasses the obligation to act when there is "a risk of such consequences, sufficiently great to lead a reasonable person in the [actor's] position to anticipate them, and to guard against them."[11] Prosser & Keeton, Torts § 31, at 169. In other words, the first element of negligence imposed by society upon its members simply requires an actor to guard against those risks that are reasonably foreseeable. See generally *Kavanagh* v. *Trustees of Boston Univ.*, 440 Mass. 195, 203 (2003); *Hebert* v. *Enos*, 60 Mass. App. Ct. 817, 821 (2004), quoting from *Falk* v. *Finkelman*, 268 Mass.

---

[10]There are, of course, important differences, including the heightened burden of proof in criminal cases and the unavailability of the comparative negligence statute. G. L. c. 231, § 85. See *Commonwealth* v. *Galluzzo*, 25 Mass. App. Ct. 568, 571-572 (1988).

[11]The following statement from the same text expands upon this notion:

"The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may possibly follow. Risk, for this purpose, may then be defined as a danger which is apparent, or should be apparent, to one in the position of the actor. The actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward with the wisdom born of the event."

Prosser & Keeton, Torts § 31, at 170 (footnotes omitted).

524, 527 (1929) ("One is bound to anticipate and provide against what usually happens and what is likely to happen, but is not bound in like manner to guard against what is . . . only remotely and slightly probable").

Here, Gauthier and Edwards had both told Erickson minutes before the incident that they would be backing up through the intersection between the mall entrance and Route 28 and going to the paver that was located on the other side of that intersection. Erickson's sole responsibility that day was to see that traffic could safely pass through that intersection within the work zone. During their conversation, Edwards obtained Erickson's explicit agreement to "watch their backs" as they came through the intersection. In addition, Gauthier pointed his truck out to Erickson and told him that he would be backing up next.

Gauthier knew that he could not see directly behind his truck once he started backing up and took certain additional precautions to insure that he could do so safely. He rolled down his driver's side window, turned off both radios in his cab, and visually checked the path behind his truck for Erickson, and presumably anyone else who might be in the way. Gauthier only began to back up after seeing Erickson standing in a location on the roadway that was "far enough away" from his intended path of travel. Gauthier backed up very slowly, looking in both side mirrors, but keeping his attention primarily focused on his passenger's side mirror to avoid hitting the trucks that were parked on the right side of the road, his closest obstacles. Gauthier was aided in checking behind him by Edwards, who, from his position in front of Gauthier, was able to see to his left and behind Gauthier's truck. Gauthier did not see Erickson again until he looked in his driver's side mirror and saw him trapped under the rear axle.

We begin our analysis with the assumption that Gauthier owed a duty to Erickson to exercise reasonable care for Erickson's safety while backing up his truck; the issue to be resolved is whether Gauthier breached that duty of care. We determine that in the circumstances of this case, it could not be proved beyond a reasonable doubt that Gauthier breached that duty of care. As described in detail above, Gauthier took all reasonable precautions to insure the safety of Erickson, particularly given

that Erickson's responsibility on the job site was to protect the motorists who had to pass through the site during the hours of construction, with the concomitant responsibility of insuring the safety of the construction workers. See generally *Goldstein* v. *Gontarz*, 364 Mass. 800, 806-807 (1974) ("The backing of a vehicle is *not* among the few situations which invariably demand heightened or 'extreme' care . . . , [but] [r]ather the cases indicate that the amount of care required depends upon the specific setting" [emphasis added]). In short, the Commonwealth failed to establish beyond a reasonable doubt that Gauthier failed to use due care in backing his vehicle.

Finally, the Commonwealth argues that the defendant's failure to install a functioning back-up alarm on Gauthier's truck was a breach of its legal duty and a proximate cause of Erickson's death. Even if we were to assume that the failure to have a working back-up alarm constituted a breach of the defendant's duty, a conclusion that is far from clear, in the circumstances of this case, there is no evidence that a back-up alarm would have changed the result, and thus no evidence of a causal nexus. See *Clough* v. *New England Tel. & Tel. Co.*, 342 Mass. 31, 37 (1961).

Edwards's truck, which was backing up directly in front of Gauthier's truck, had a functioning back-up alarm. That sound, however, apparently did not alert Erickson to the backing vehicles because he continued to walk with his back to the trucks, away from, but nevertheless in the path of, those trucks. When two truck drivers, each in a different location, realized that Erickson was unaware of the backing truck, they each began to sound their air horns. Given that a single air horn is significantly louder than a back-up alarm, two air horns blowing continuously and at the same time, as was the case here, undoubtedly drowned out the noise of Edwards's back-up alarm. More significantly, the air horns were loud enough to draw the attention of virtually everyone at or near the scene, except for Erickson, who remained steadfastly focused on his hands.

In these circumstances, the evidence is insufficient to show that the failure to have a functioning back-up alarm caused the accident. Erickson knew the trucks were going to be backing up; he did not need to be warned by a beeping sound. It is

speculative in the unique circumstances of this case to suggest that Erickson would have reacted any differently to the sound of a back-up alarm on Gauthier's truck. Put differently, the evidence is insufficient to establish beyond a reasonable doubt that the failure to install a back-up alarm was the proximate cause of the accident.

*Judgment reversed.*

*Verdict set aside.*