Carlos LOPEZ and Ondina E. Benitez

v.

EQUITY OFFICE MANAGEMENT, LLC.

Civil Action No. 06–11274 RGS.

United States District Court, D. Massachusetts.

Feb. 10, 2009.

Bryan E. Chase, Haverhill, MA, for Carlos Lopez.

James M. Dunn, Michael W. Gallagher, Gallagher & Cavanaugh LLP, Lowell, MA, Michael A. Fitzhugh, Fitzhugh, Parker & Alvaro, LLP, Boston, MA, for Equity Office Management, L.L.C.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

This negligence action against Equity Office Management, LLC (Equity) arose out of a tragic scaffolding accident. Plaintiff Carlos Lopez and a co-worker, Jose Camara, employees of UNICCO Services Company (UNICCO), fell while washing the exterior windows at the four-story Building 6 in New England Executive Park (6 NEEP) in Burlington, Massachusetts. A rolling outrigger suspended from the roof of 6 NEEP came off its tracks,

plunging Lopez and Camara to the ground.[1] Camara was killed. Lopez survived, but is partially disabled. Equity manages 6 NEEP. UNICCO is an independent window washing contractor. Equity hired UNICCO to perform window washing services at Boston-area commercial buildings that it manages for its affiliate Equity Office Properties Trust (Equity Trust).

Equity contends that its contract with UNICCO absolves it of liability as "it retained no control over the means and methods employed by UNICCO to wash windows." Plaintiffs maintain that Equity "reserved certain express rights for itself to control exterior window washing activities at its properties" and that the reservation is sufficient to defeat any defense to liability.

## BACKGROUND

In a separate incident in May of 2003, two UNICCO window washers fell to their deaths while washing exterior windows at an Equity Trust property at Center Plaza in Boston. It was later determined that the window washers had failed to attach themselves to the roof with independent life-lines.[2] The accident occurred when the horizontal safety line the workers had strung instead snapped in two. Immediately following the accident, Equity ordered a "stand-down" of all exterior window washing operations at its properties. Before permitting window washing operations to resume, Equity revised its Master Window Washing Services Agreement (Agreement) to require contractors to comply with all applicable federal, state, and local safety regulations. The revised Agreement expressly incorporated the 2001 industry safety standard for exterior window washing. See International Window Cleaning Association (IWCA)/American National Standards Institute (ANSI) I–14.[3]

On September 12, 2003, Equity and UNICCO entered an Agreement that included window washing services at 6 NEEP. The Agreement stated that UNICCO was to provide "all labor, supervision, material and equipment necessary to perform and complete the Services in all respects in accordance with the Contract Documents" and that UNICCO was to take "all reasonable measures to ensure the safety of its employees and agents ... during the performance of the Services." The Agreement defined "Services" to include routine services, property specific services, and periodic services, as set forth in Exhibits D,

1. Equity contends that Camara caused the accident by improperly securing the wheels of the outrigger. Equity also notes that neither Camara nor Lopez were tied to the roof by an independent safety line, a standard window washing safety precaution. Plaintiffs do not offer a different version of the accident.

2. No building defect was implicated in the accident.

3. ANSI approved the IWCA I–14.1 Window Cleaning Safety Standard for publication as an American National Standard on October 25, 2001. The I–14.1 standard is an industry standard that identifies accepted safe practices for window cleaning. The ANSI/IWCA I–14.1 Window Cleaning Safety Standard is the source document used by OSHA to enforce window cleaning safety regulations. The I–14.1 standard prohibits the use of suspended access equipment for exterior window washing work unless the building is equipped with a certified roof anchor system. It also requires that roof anchors be inspected annually. The I–14.1 standard requires that window cleaning contractors submit a written work plan (Plan of Service) to the property manager prior to performing window washing operations. The purpose of the work plan required by I–14.1 is to inform the building owner/property manager that the contractor has performed a site assessment at the property, has identified hazards that might be encountered, and has taken steps to prevent accidents related to those hazards.

E and F, attached to and "deemed incorporated and made a part" of the Agreement.

Exhibit D, which sets out the "scope" of the contemplated services, required UNICCO's "conformance with all legal and code requirements." It also required that the services be performed "by qualified, careful and efficient employees in conformity with best industry practices and to [Equity]'s satisfaction." The Agreement provided in salient part that

> [UNICCO] shall be responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with Services and shall comply with all applicable safety laws, industry standards and take all reasonable precautions for safety of ... [UNICCO] employees.... [UNICCO] shall have in its employment at all times a sufficient number of capable and appropriately licensed employees to properly, adequately, safely and promptly provide all Services.... [UNICCO] agrees each of its employees will be properly qualified and will use reasonable care in the performance of Services.... [UNICCO] shall be responsible for the supervision and execution of Services by its employees, and that [UNICCO] shall have sole responsibility for means, methods, techniques, procedures, safety precautions or employment practices in connection with [UNICCO's] performance of Services.... [UNICCO] expressly acknowledges that [Equity] is relying on [UNICCO's] professional expertise in performance of Services to achieve desired results.

The Agreement further assigned UNICCO responsibility for on-site pre-wash inspections of window washing equipment, and required UNICCO to give written confirmation of the results to Equity. Equity retained the right to demand in writing that UNICCO replace any employee whose performance Equity found unsatisfactory, disruptive, or annoying to building occupants or other contractors.

Consistent with the Agreement, UNICCO drafted ANSI-compliant work plans for its Equity window washing operations. UNICCO's Assistant Window Washing Manager, Sergio Serpa, created the work plan for 6 NEEP.[4] Under the plan, Equity's safety responsibilities were limited to "repair[ing], maintain[ing] and conduct[ing] annual inspections of window washing equipment on site."[5] The only window washing equipment on site at 6 NEEP consisted of the rooftop anchor points. The work plan additionally required Equity to provide UNICCO with a plot plan of the roof indicating the location of the anchors. *See* Ex. 1 (Master Services Agreement), §§ III(B) 1–3, Ex. D § 2.3.1.

Lopez had been employed by UNICCO as a window washer for eleven years prior to the June 8, 2005 accident. Lopez's training was limited to on-the-job experience, although during the seven years prior to the accident he had attended annual safety training classes offered by UNICCO.

Lopez and his wife, Ondina Benitez, filed their Complaint initially in the Superior Court. The Complaint detailed Lopez's

---

4. A standard form window washing work plan is set out as a template exhibit in the ANSI standard. *See* IWCA/ANSI I–14.1–2001.

5. The ANSI standard recommends that building owners certify that all roof anchor points have been inspected and pull-tested. The ANSI standard further recommends that window washing contractors perform a pre-wash site assessment at each location, and notify the building owner of any hazardous conditions that need be corrected.

numerous injuries, including fractures, nerve damage, and trauma to the brain.[6] Equity removed the Complaint to the United States District Court on July 25, 2006. Plaintiffs amended their Complaint on July 18, 2008, to correct a misnomer. The Amended Complaint is in three counts: negligence (Count I); negligent infliction of emotional distress (Count II); and loss of consortium (Count III). Equity filed the instant motion for summary judgment on April 21, 2008.[7] A hearing on the motion was held on August 20, 2008.

*DISCUSSION*

A district court grants summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir.2000). A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmovant in turn bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top–Flite Golf Co.,* 335 F.3d 15, 19 (1st Cir.2003). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Consequently, "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Torres v. E.I. Dupont De Nemours & Co.,* 219 F.3d 13, 18 (1st Cir.2000) (internal quotations and citations omitted).

There are four elements to a negligence claim: "(1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff." *Delaney v. Reynolds,* 63 Mass.App.Ct. 239, 241, 825 N.E.2d 554 (2005). Summary judgment is rarely granted in negligence actions; however, it is appropriate if a plaintiff has no reasonable prospect of proving one or more of the elements of his claim. *Hebert v. Enos,* 60 Mass.App.Ct. 817, 820–821, 806 N.E.2d 452 (2004), citing *Kent v. Commonwealth,* 437 Mass. 312, 320, 771 N.E.2d 770 (2002). *See also Glick v. Prince Italian Foods of Saugus,* 25 Mass.App.Ct. 901, 902, 514 N.E.2d 100 (1987) (negligence questions may be decided as a matter of law "where no rational view of the evidence would warrant a finding of negligence."); *Roderick v. Brandy Hill Co.,* 36 Mass.App.Ct. 948, 949, 631 N.E.2d 559 (1994) (same).

■ Plaintiffs assert that Equity owed a duty to Lopez "to properly supervise those workers which it brought on to the premises *which it controlled and managed* to ensure that OSHA regulations are followed

---

**6.** According to the Complaint, Lopez has incurred over $150,000 in medical bills.

**7.** The initial resistance to Equity's dispositive motion was discovery-related, and focused not on the cause of the accident but on plaintiffs' attempts to gather evidence to show that Equity had maintained sufficient control over UNICCO to establish liability under *Corsetti v. Stone Co.,* 396 Mass. 1, 483 N.E.2d 793 (1985), and RESTATEMENT (SECOND) OF TORTS § 414. Plaintiffs contended that Equity had "obstinately refused to comply with its discovery obligations, including ... not producing its liability expert Stephan Bright for deposition...." Magistrate Judge Collings was ultimately able to resolve the discovery dispute. In September of 2008, the parties filed supplemental briefing on the issue of employer liability.

... to eliminate dangers and enforce compliance with OSHA regulations among workers at the premises." (Emphasis added). So stated, there is little to which Equity can object. *See Corsetti*, 396 Mass. at 11, 483 N.E.2d 793. Plaintiffs further allege that Equity failed to "exercise any supervisory role over the window washers at the [6 NEEP] premises or to take any action to protect those workers at the premises." Again, so framed, Equity cannot object (as it disclaims any supervisory role with respect to UNICCO's workers). However, plaintiffs' final claim is that "Equity deviated from the established standard of care that it owed of customary industry and trade practices" and thereby breached a duty of care to Lopez. On this issue, the battle is joined.

In *Corsetti*, the Supreme Judicial Court gave definitive shape to the legal standard governing the duty owed by an employer (general contractor) to the employees of an independent contractor who are injured while performing work at the general contractor's behest. Under *Corsetti*, the employer "may be liable for any negligence *of his own* in connection with the work to be done. . . . So far as he in fact gives directions for the work, furnishes equipment for it, *or retains control over any part of it*, he is required to exercise reasonable care for the protection of others." *Id.*, 396 Mass. at 9–10, 483 N.E.2d 793 (emphasis in original), quoting W. Prosser, Torts § 71, at 469 (4th ed. 1971). In particular, where the employer entrusts a part of the work to the independent contractor, "but himself or through a foreman superintends

the entire job . . . [he] is subject to liability if he fails to prevent the [independent contractor] from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the [independent contractor's] work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself." *Id.*, 396 Mass. at 10–11, 483 N.E.2d 793, quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. b.

In essence, "[t]here must be such retention of a right of supervision that the contractor is not entirely free to do the work his own way." *Foley v. Rust Int'l*, 901 F.2d 183, 184 (1st Cir.1990), quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c.[8] In *Foley*, the First Circuit held that "to get past the Comment [c], [plaintiff] must show that [the contractor] maintained more than general control over [the subcontractor]." Foley, an apprentice boilermaker employed by Riley–Stoker (Riley), was injured while working for Riley at a site owned by Rust. Although a jury found for Foley, the First Circuit affirmed the entry of a J.N.O.V. for Rust. The Circuit Court found that the evidence did not show that Rust had retained sufficient control over Riley's work to impose a duty owed by Rust to Foley. The Court summarized the case as follows.

The contract between Rust and Riley stated Riley's obligation explicitly:

Subcontractor alone is obligated to provide for the safety of his employees at

---

8. Comment c to the RESTATEMENT (SECOND) OF TORTS § 414 (1965), states that: [i]t is not enough that [the employer] has merely a right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and

deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

the jobsite. Subcontractor agrees to perform the work in a safe manner, to provide a safe place to work, and to abide by and enforce all federal, state, and local safety laws, rules or regulations governing the performance of the work....

The contract also required Riley to conform to all of Rust's safety regulations and cooperate with the other safety programs in operation at the job site. Furthermore, Riley's safety program was subject to review and acceptance by Rust. But under the explicit terms of the contract, the only option available to Rust, upon noticing a safety violation, was to ask that work be suspended.... Rust did not, within the meaning of the Restatement or *Corsetti*, retain sufficient control over the subcontractor. All Rust retained was the general right, referred to in Comment C, to stop the work. That is not enough control to impose liability, particularly when the contract is explicit that safety is the responsibility of the subcontractor. There was no evidence that Rust retained a right of supervision over Riley such that Riley was not entirely free to do the work in its own way.

*Id.* at 185 (footnote omitted).

■ Whether the evidence demonstrates that the employer retained sufficient control over a material aspect of the work of an independent contractor to subject it to § 414 liability is in most cases a question of fact for the jury. *Corsetti,* 396 Mass. at 11, 483 N.E.2d 793. In rare instances, however, the issue of liability may be decided as a matter of law where the undisputed material facts demonstrate that the employer did not exercise any "meaningful control, however minimal, over the subcontractor." *Kostrzewa v. Suffolk Constr. Co., Inc.,* 73 Mass.App.Ct. 377, 379, 897 N.E.2d 1272 (2008), quoting

*Dilaveris v. W.T. Rich Co.,* 424 Mass. 9, 11, 673 N.E.2d 562 (1996).

In *Kostrzewa,* the legal and factual issues were almost identical to those presented here. A subcontractor's employee had fallen from scaffolding at a job site owned by Suffolk Construction Co. (Suffolk), suffering severe injuries. Plaintiff Kostrzewa was employed by Superior Abatement Co. (Superior), a subcontractor hired by Suffolk. Kostrzewa alleged negligent oversight of job safety on the part of Suffolk. The trial judge granted summary judgment to Suffolk, holding that as a matter of law, Suffolk had not retained sufficient control over Superior's work to owe a duty to Kostrzewa. The Massachusetts Appeals Court reversed, finding the evidence sufficient to create an issue of fact for the jury. The Appeals Court's (lengthy) summary of the facts is instructive.

The contract between Suffolk and the building owner conferred on Suffolk general responsibility and control for the project, including responsibility for safety. The contract provided that "[Suffolk] shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the [c]ontract...." In the area of safety, Suffolk was "responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the [c]ontract." Moreover, Suffolk was required to "take reasonable precautions for safety of and shall provide reasonable protection to prevent damage, injury or loss to ... employees on the Work and other persons who may be affected thereby." Suffolk was required to "erect and maintain ... reasonable safeguards for safety and protection." The contract also allocated to

Suffolk sole responsibility "for all injuries to persons ... caused by or resulting from [its] negligence." Finally, the contract required Suffolk to "designate a responsible member of [its] organization at the site whose duty shall be the prevention of accidents." These various provisions of the contract indicate that Suffolk was to control the project, including all aspects of safety.

In addition to the contract provisions, there was further evidence suggesting that Suffolk had more than minimal control over the safety aspects of the project. Suffolk had a project safety manager on site. Suffolk's safety manual required its management to "maintain an interest and participate in the safety program by checking on safety when visiting a Job site," placed responsibility on Suffolk's director of safety to perform periodic safety inspections of the project site, and required Suffolk's superintendent to conduct routine safety inspections and to address any safety issues. With respect to the asbestos abatement work in particular, Suffolk, as required by the contract documents, created viewing windows so that supervisors could observe the work taking place in the containment areas, which were otherwise surrounded by an opaque barrier. It was not unusual for Suffolk employees to look through the windows. On the day of the accident, the project's daily log (which was on a Suffolk form) showed that a Suffolk foreman performed "Supervision, Safety, [and] Security" on the project. The log shows only asbestos abatement work occurring on that day, allowing the inference that the Suffolk foreman was performing supervision, safety, and security in connection with the asbestos abatement work. Furthermore, Suffolk required Superior to report weekly on its (Superior's) safety meetings. The report was submitted on Suffolk letterhead.

*Id.* at 379–381, 897 N.E.2d 1272. Moreover, in approving a subcontract between Superior and North American Site Developers, Inc. (NASDI) (the subcontractor whose negligence is alleged to have caused the accident), Suffolk reserved the right to change at any time the scope of the work performed by NASDI and to terminate the subcontract if NASDI failed to carry out the work in accordance with Suffolk's safety manual. Suffolk further required that NASDI receive permission from Suffolk's superintendent prior to removing "any temporary rails or protection on the site." Suffolk finally reserved the right to vet and approve NASDI's full-time project manager and lead foreman.

Although the Appeals Court reversed the grant of summary judgment and remanded the case back for trial, it noted in a very telling conclusion that "[t]his [remand] is not to suggest that we think the record on control was strongly in favor of Kostrzewa. Indeed, there was much evidence to the contrary. However, we think that the evidence was sufficient to defeat summary judgment." *Id.* at 379 n. 7, 897 N.E.2d 1272.[9]

Plaintiffs, in their Opposition Memorandum and post-hearing supplemental briefs, marshal the entire sum of the evidence that they contend demonstrates that Equity had retained sufficient control over UNICCO's work to raise a factual issue of liability.

Under the terms of the Agreement, Equity reserved certain express rights for

---

**9.** Attached to this decision is an Appendix laying out in table form a comparison of the material elements of supervisory control found in *Kostrzewa* and those that apply to the instant case.

196

itself to control exterior window washing activities at its properties. Specifically, Equity required that UNICCO provide Equity with numerous documents to ensure the safety of window washing operations, including a "daily log" of all cable and rope inspections, and provide Equity a written copy of this log. Further, Equity required that UNICCO warrant that all inspections be completed by a competent person and that it would prepare a written certification of the "competent person," on site. Moreover, Equity required that this written documentation was to be presented to Equity, or Equity's agent, prior to commencing services following each pre-wash inspection.

Additionally, in the "Scope of Services" portion of the Agreement, section ¶ 1.5.3, entitled "Personnel Issues," Equity required that UNICCO "agrees that each of its employees will be properly qualified and will use reasonable care in the performance of Services." Further, this provision gave Equity the express right, at its discretion, to require UNICCO to provide a replacement for any employee found to be unqualified, bothersome to building occupants, or otherwise detrimental to Equity. This provision also stated that Equity required that all UNICCO employees "shall report to designated property personnel upon arrival" at the Equity property.

Equity initially sought to ensure that UNICCO employees were fully trained in accordance with the ANSI I–14 Standard. In its August 29, 2003 letter to Equity, UNICCO provided a list of competent persons and their most recent training dates. That list was never up-

dated, and neither Jose Camara nor Carlos Lopez appear on that list.

Plaintiffs further argued that in the wake of the 2003 accident at Center Plaza, Equity restricted "access to the roof of Building 6 at NEEP and could have denied UNICCO workers' [access]." [10]

In terms of the window washing operation itself, Equity's only affirmative safety-related duty was to provide, inspect, and maintain the roof anchor points. Michael Fitzgerald, Equity's Rule 12(b)(6) deponent, testified that Nazeih Hammouri, a structural engineer, was assigned by Equity "to facilitate the design, testing and overall maintenance program to achieve having a certified anchoring system in place at the properties." Hammouri was also responsible for surveying the anchor points and the washers' "drop-off" spots. There is no evidence that Equity (or Hammouri) failed to perform these duties or deviated in any respect from the ANSI I–14.1 standard. Rather, it is undisputed that "Equity installed, inspected, tested, and maintained a certified roof system at 6 NEEP that provided tie-backs for transportable rigging devices such as the rolling rig, or 'mule,' used by Lopez and Camara. The roof system at 6 NEEP also included independent attachment points for safety lines all workers on the roof or suspended from the roof are required to use." In addition, Equity posted the roof anchor diagram on the access door to the roof for the use of UNICCO employees. *See* Ex. 15 (Roof Diagrams of 6 NEEP); Abraham Dep., at 28.

In terms of its supervision of UNICCO, Equity retained only the right to require written confirmation that UNICCO was in compliance with government safety regulations and ANSI requirements. Lopez argues that "Equity required that this writ-

**10.** Equity required UNICCO employees to report to building security upon arrival at a job site so that a "building engineer" could escort them to the roof.

ten documentation was to be presented to Equity, or Equity's agent, prior to commencing services following each pre-wash inspection.... These requirements could not be disregarded by UNICCO." This may be true. But fulfilling these requirements was a duty that UNICCO owed to Equity, not one that Equity owed to Lopez. There is no evidence that Lopez was an intended beneficiary of UNICCO's reporting obligation. *See Spinner v. Nutt*, 417 Mass. 549, 555, 631 N.E.2d 542 (1994) (to recover as a third party beneficiary, a plaintiff must show that he was an intended beneficiary of the contract, and not merely an incidental beneficiary). The intended beneficiary of the provision was clearly Equity, not Lopez.[11]

Lopez finally contends that Equity owed him a duty as the "owner" of 6 NEEP (Equity Trust is the actual owner) to maintain the 6 NEEP premises in a reasonably safe condition. *Poirier v. Town of Plymouth*, 374 Mass. 206, 208, 372 N.E.2d 212 (1978). That such a duty exists is beyond peradventure. However, plaintiffs offer no evidence that Equity breached that duty or that the condition of the tie-backs and the anchor points played any part in Lopez's accident.

As Lopez's negligence claims fail, so does Count III, the claim for loss of consortium. "[A] claim for loss of consortium requires proof of a tortious act that caused the claimant's spouse personal injury.... Although we have determined that a claim for loss of consortium is independent of the spouse's cause of action, ... we have not repudiated the implicit prerequisite that the injured spouse have a viable claim." *Sena v. Commonwealth*, 417 Mass. 250, 264, 629 N.E.2d 986 (1994).

### ORDER

For the foregoing reasons, Equity's motion for summary judgment is *ALLOWED* as to all counts of the Amended Complaint. The Clerk will enter judgment for Equity and close the case.

SO ORDERED.

### APPENDIX [12]

| Employers' Rights and Obligations | Suffolk Constr. | Equity |
|---|---|---|
| General Oversight Responsibility for all Project Work | Yes | No |
| General Oversight Responsibility for all Aspects of Safety | Yes | No |
| Duty to Implement Job Specific Safety Programs | Yes | No |
| Right to Dismiss Subcontractors | Yes | No |

11. Even were there evidence that would permit a jury to find that the contract created a duty on Equity's part to control UNICCO's behavior, to sustain an action in negligence, a plaintiff must show that a breach of that duty by the defendant was the proximate or legal cause of his injury. *Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir. 1990). *See also Dunsmoor v. Cowdrey*, 316 Mass. 516, 519–520, 56 N.E.2d 20 (1944) (negligence is only of legal consequence when it is a contributing cause of an injury). Lopez has offered no legally viable causal link between Equity's alleged failure to insist on more regular safety reporting from UNICCO and his injuries. *See Flesner v. Tech. Commc'ns Corp.*, 410 Mass. 805, 809, 575 N.E.2d 1107 (1991). Lopez's expert liability witness, C.J. Abraham, articulated a somewhat different theory, testifying to his opinion that Equity breached its duty of care to Lopez "by allowing untrained window washers access to their roof and property without adequate training and supervision." Abraham Dep., at 28. But it was UNICCO's contractual duty, not Equity's, to provide competent window washers and to supervise their safety.

12. Comparing the rights, obligations, and practices of the employers in Suffolk Construction and this case.

| | | |
|---|---|---|
| Duty to Supply On Site Project Safety Manager | Yes | No |
| Senior Management Involved in Day-to-Day Safety | Yes | No |
| Duty to Conduct Weekly Contractor Safety Meetings | Yes | No |
| Right to Approve Contractor's Project Foreman | Yes | No |
| Right to Approve Contractor's Project Manager | Yes | No |
| Right to Enforce Employer Safety Manual and Standards | Yes | No |
| Prior Permission Required for Contractors to Remove Scaffolding | Yes | No |
| Right to Alter Scope of the Work in progress | Yes | No |
| Duty to Conduct Periodic Safety Inspections | Yes (weekly) | Yes (annually) |
| Right to Request Written Certification of Safety Compliance | Yes | Yes |