## Commonwealth vs. Angelo Todesca Corporation.

Barnstable. November 8, 2005. - March 1, 2006.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Homicide. Motor Vehicle,* Homicide. *Corporation,* Criminal responsibility. *Way,* Public: what constitutes.

Statement of the standard of review used by this court in reviewing a decision on a motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), for a required finding of not guilty following a guilty verdict at a criminal trial. [132-133]

This court concluded that a corporation may be held criminally liable for motor vehicle homicide under G. L. c. 90, § 24G (*b*), arising out of the negligent operation of a motor vehicle by its agent while engaged in corporate business that the agent has been authorized to conduct. [133-137]

At the trial of an indictment charging the defendant, a trucking and paving company hired for a highway improvement project, with motor vehicle homicide, G. L. c. 90, § 24G (*b*), after a truck driver employed by the defendant struck and killed a police officer directing traffic through the work site, the evidence established that the truck driver had operated the truck negligently. [137-140] Cordy, J., dissenting, with whom Marshall, C.J., and Cowin, J., joined.

At the trial of an indictment charging the defendant, a trucking and paving company hired for a highway improvement project, with motor vehicle homicide, G. L. c. 90, § 24G (*b*), after a truck driver employed by the defendant struck and killed a police officer directing traffic through the work site, the evidence established that the truck driver's negligence had caused the victim's death [140-142], and that the collision had occurred on a public "way," as required by the statute [142-143].

Indictments found and returned in the Superior Court Department on April 9, 2002.

The case was tried before *Richard F. Connon,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

*Jeffrey T. Karp* for the defendant.

Spina, J. A jury found the defendant, a corporation, guilty of

homicide by motor vehicle under G. L. 90, § 24G (b),[1] after a truck driver employed by the defendant struck and killed a police officer.[2] On appeal the defendant contends that the judge erred in denying its motion for a required finding and its post-trial motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), in which it argued that the Commonwealth presented insufficient evidence of negligent operation, proximate cause, and operation on a public way, and that a corporation cannot be criminally liable for motor vehicle homicide as a matter of law. The Appeals Court reversed the conviction, concluding that there was insufficient evidence of both the driver's negligence and causation, without reaching the other issues. *Commonwealth v. Angelo Todesca Corp.*, 62 Mass. App. Ct. 599 (2004). We granted the Commonwealth's application for further appellate review, and we affirm the conviction.

1. *Facts.* Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts. See *Commonwealth v. Latimore*, 378 Mass. 671, 676-677 (1979). In December, 2000, Brian Gauthier, an experienced truck driver, was employed by the defendant, Angelo Todesca Corporation, a trucking and paving company. At the time, Gauthier was driving a ten-wheel tri-axle dump truck, designated AT-56, for the defendant; he had driven this particular vehicle for approximately one year.[3] The defendant had a written policy, published in its safety manual, requiring all trucks to be equipped with back-up alarms, which sound automatically whenever the vehicle is put in reverse gear, at all times.[4] The purpose of this alarm, affixed to the back of the truck near the

---

[1]General Laws c. 90, § 24G (b), provides: "Whoever, upon any way or in any place to which the public has a right of access or upon any way or in any place to which members of the public have access as invitees or licensees . . . operates a motor vehicle recklessly or negligently so that the lives or safety of the public might be endangered and by any such operation causes the death of another person, shall be guilty of homicide by a motor vehicle . . . ."

[2]The defendant also was charged with involuntary manslaughter under G. L. c. 265, § 13, based on this incident; the jury found the defendant not guilty of this offense.

[3]The defendant's practice was to assign the same truck to the same driver each day, to enable the driver to become familiar with the operation of that particular vehicle.

[4]Page four of the safety manual, admitted in evidence at trial, stated: "The

driver's side taillight, is to warn people behind the truck, particularly those in its blind spot, that the vehicle is in reverse.

When Gauthier was first assigned to AT-56, the truck had a functioning back-up alarm, but around November, 2000, he realized that the back-up alarm was missing. The defendant's mechanic determined that the vehicle's electrical system was working properly: it simply needed a new alarm installed. The mechanics did not have a back-up alarm in stock at the time. Although Gauthier continued to operate the truck without the back-up alarm, he noted its absence each day in a required safety report.[5] All of the other trucks Gauthier had operated for the defendant had back-up alarms, and at least one other of the defendant's drivers never had operated a truck without an alarm.

In late 2000, the defendant was hired to provide asphalt for a roadway widening and improvement project on Route 28, a State highway, in Centerville. On December 1, 2000, the defendant's drivers were repaving a mile-long section of Route 28 near the entrance to a shopping mall. Although different sections of the four-lane highway were closed as the paving work progressed, the mall was open for business, and at least one lane always remained open to traffic. To ensure that vehicles could enter and leave the mall safely, the victim, a sixty-one year old police officer, was stationed near the driveway leading into the mall parking lot, directing traffic through the work site. The victim had worked such details before and requested this assignment at the site. He wore a full-length bright orange raincoat and a hat with ear flaps, but he had no difficulty hearing or communicating with the work crew.

On December 1, Gauthier was assigned to haul asphalt from a plant in Rochester to the work site in Centerville, and he made three trips from the plant to Centerville that day. His truck weighed more than 79,000 pounds when carrying a full load of asphalt. When Gauthier delivered his first load, he

_____

following guidelines are adhered to at all time[s]: . . . All vehicles are to be equipped with back up alarms, reflectors, fire extinguishers, lights, brakes, seat belts, and windshield wipers." The defendant's mechanics testified that they installed these alarms on all the trucks in the defendant's fleet.

[5]The defendant gave a driver or mechanic discretion to determine whether a truck was safe to operate. If a truck did not run, however, its driver was not paid.

beeped his "city horn" as he backed up to the paver, to warn people nearby that the truck was moving. He did not use his horn while backing up with the second load of asphalt because no one was near his truck at that time.

When he arrived at the work site with his third load of asphalt, Gauthier conversed briefly with several other drivers and the victim to discuss the order in which the drivers should deliver their asphalt. They decided that Gauthier should back up first, and he told the victim that he was next in line for the paver. Another driver then asked the victim to "watch our back[s]" as the trucks backed through the intersection. No one informed the victim that Gauthier's truck did not have a functioning back-up alarm. When Gauthier returned to his truck, he turned off the radios, rolled down his window, checked his mirrors, put the truck in its lowest reverse gear, and began to back up.[6] A number of witnesses estimated his speed at no more than a few miles per hour. Before Gauthier started to back up, he noticed that the victim was walking toward the paver, with his back to the truck.[7] At one point while Gauthier was backing up, he had to stop to allow a car leaving the mall to pass. When he resumed moving, another driver realized that the victim was in Gauthier's blind spot and repeatedly blasted his truck's air horn, but neither the victim nor Gauthier reacted.[8] Other drivers also saw that the victim was in Gauthier's blind spot, and tried to get Gauthier to stop by shouting and waving their arms, but to no avail: Gauthier's truck struck the victim, pinning his legs beneath its rear wheels. As soon as Gauthier saw the victim trapped under his rear axle, he pulled the truck forward.[9] The

[6]Another driver was backing up at the same time as Gauthier, approximately fifty to sixty feet in front of his truck. This driver's truck did have a functioning back-up alarm, which was sounding as he backed up.

[7]One witness testified that the victim was looking down as he walked toward the paver, and that he appeared to be "doing something with his hands," although this witness could not actually see the victim's hands. Another witness testified that the victim was looking down the road.

[8]Gauthier testified that he heard horns as he backed up, but he did not know who was sounding the horns or why.

[9]Gauthier estimated that from one to five minutes had elapsed between his conversation with the victim and the collision.

victim was conscious and alert when he was taken to a hospital, but he died as a result of his injuries later that day.[10]

Gauthier was charged with manslaughter, motor vehicle homicide, and failure to use due care in backing up. Before the defendant's trial, the manslaughter charge against Gauthier was dismissed, and the remaining charges were continued without a finding for three years. Gauthier's driving privileges were restricted, and he paid a fine.

The jury convicted the corporation of motor vehicle homicide, but found it not guilty of involuntary manslaughter. At sentencing, the defendant was fined $2,500. The Appeals Court, however, reversed the conviction, finding insufficient evidence of Gauthier's negligence because while he backed up he "took all reasonable precautions" to ensure the victim's safety. *Commonwealth* v. *Angelo Todesca Corp.*, 62 Mass. App. Ct. 599, 607-608 (2004). The Appeals Court also concluded that there was insufficient evidence that the absence of a functioning back-up alarm caused the collision: the victim knew the truck was going to back up and "did not need to be warned by a beeping sound." *Id.* at 608. The Appeals Court found it "speculative" to suggest that a back-up alarm could have prevented the collision because the victim did not react to the much louder air horns sounded by other drivers. *Id.* at 608-609.

2. *Standard of review.* In determining whether the evidence presented at trial was sufficient to sustain a conviction, we must view that evidence in the light most favorable to the Commonwealth to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). "A jury may find a crime proved beyond a reasonable doubt even though the inference of guilt from the facts established is not inescapable or necessary." *Commonwealth* v. *Gagnon*, 408 Mass. 185, 200-201 (1990).

---

[10]Barnstable police officials investigating the collision believed that the victim's condition was stable, and that they could interview him after he was taken to the hospital. On scene, the victim told police that he was facing away from the truck when he was hit; in the ambulance, the victim told a paramedic that he "had really screwed up."

Such inferences need only be reasonable and possible. See, e.g., *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). "If, from the evidence, conflicting inferences are possible, it is for the jury to determine where the truth lies, for the weight and credibility of the evidence is wholly within their province." *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005). Likewise, in reviewing a decision on a rule 25 (b) (2) motion for a required finding of not guilty following a guilty verdict, this court "does not properly exercise discretion concerning the weight or integrity of the evidence, but instead must assess the legal sufficiency of the evidence by the standard set out in *Commonwealth* v. *Latimore*, [*supra*]." *Commonwealth* v. *Doucette*, 408 Mass. 454, 456 (1990).

3. *Corporate liability for motor vehicle homicide.* As a threshold matter, the parties agree that corporate criminal liability is governed by the standards outlined in *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910 (1972), and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972), and in *Commonwealth* v. *L.A.L. Corp.*, 400 Mass. 737 (1987). In *Commonwealth* v. *Beneficial Fin. Co.*, *supra* at 256, we held that before criminal liability may be imposed on a corporate defendant:

> "The Commonwealth must prove that the individual for whose conduct it seeks to charge the corporation criminally was placed in a position by the corporation where he had enough power, duty, responsibility and authority to act for and in behalf of the corporation to handle the particular business or operation or project of the corporation in which he was engaged at the time that he committed the criminal act . . . and that he was acting for and in behalf of the corporation in the accomplishment of that particular business or operation or project, and that he committed a criminal act while so acting."

We rejected the argument that corporations can be liable criminally for conduct of employees only if such conduct "was performed, authorized, ratified, adopted or tolerated by" corporate officials or managers. *Id.* at 254.

We reiterated these principles in *Commonwealth* v. *L.A.L. Corp.*, *supra* at 743, in which we concluded that a close corporation could be criminally liable for the conduct of employees who sold alcohol to minors, despite the fact that corporate officials had no knowledge of the sales, and that corporate policy strictly prohibited selling alcohol to minors. In addition to emphasizing that there is no requirement that corporate officials had knowledge of their employees' criminal acts, we also explained that the intent element of an offense does not change the applicable principle of corporate criminal liability: the standards outlined in *Commonwealth* v. *L.A.L. Corp.*, *supra* at 743 & n.3, apply to employee crimes that are malum in se and malum prohibitum.

The Appeals Court correctly summarized the elements of corporate criminal liability:

> "To prove that a corporation is guilty of a criminal offense, the Commonwealth must prove the following three elements beyond a reasonable doubt: (1) that an individual committed a criminal offense; (2) that at the time of committing the offense, the individual 'was engaged in some particular corporate business or project'; and (3) that the individual had been vested by the corporation with the authority to act for it, and on its behalf, in carrying out that particular corporate business or project when the offense occurred."

*Commonwealth* v. *Angelo Todesca Corp.*, *supra* at 605, citing Model Jury Instructions for Use in the District Court § 5.07 (1995); *Commonwealth* v. *L.A.L. Corp.*, *supra* at 744.

Although the parties do not challenge these standards of corporate criminal liability on appeal, there is significant disagreement about the application of these principles to this case. The defendant appears to concede that Gauthier was engaged in corporate business when he struck the victim, and that he was authorized by the defendant to conduct such business. Thus, the essence of the defendant's arguments deals with the first element of corporate criminal liability: namely, the requirement that an employee committed a criminal offense. The defendant maintains that a corporation never can be

criminally liable for motor vehicle homicide under G. L. c. 90, § 24G (*b*), as a matter of law because the language of a criminal statute must be construed strictly, and a "corporation" cannot "operate" a vehicle. The Commonwealth, however, argues that corporate liability is necessarily vicarious, and that a corporation can be held accountable for criminal acts committed by its agents, including negligent operation of a motor vehicle causing the death of another, if the elements of corporate criminal liability discussed above are satisfied.

We agree with the Commonwealth. Because a corporation is not a living person, it can act only through its agents. *Commonwealth* v. *L.A.L. Corp.*, *supra* at 743. See *Sarvis* v. *Boston Safe Deposit & Trust Co.*, 47 Mass. App. Ct. 86, 96 (1999), quoting *Sunrise Props., Inc.* v. *Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 66 (1997) ("A corporation is a creature of the law . . . '[that] can only act through its agents' "); *Commonwealth* v. *Duddie Ford, Inc.*, 28 Mass. App. Ct. 426, 441 (1990), *S.C.*, 409 Mass. 387 (1991), quoting *Commonwealth* v. *Beneficial Fin. Co.*, *supra* at 263-264 ("corporate criminal liability is necessarily vicarious"). By the defendant's reasoning, a corporation never could be liable for any crime. A "corporation" can no more serve alcohol to minors, or bribe government officials, or falsify data on loan applications, than operate a vehicle negligently: only human agents, acting for the corporation, are capable of these actions. Nevertheless, we consistently have held that a corporation may be criminally liable for such acts when performed by corporate employees, acting within the scope of their employment and on behalf of the corporation. See *Commonwealth* v. *L.A.L. Corp.*, *supra* (sale of alcohol to minors); *Commonwealth* v. *Beneficial Fin. Co.*, *supra* (bribes to government officials); *Commonwealth* v. *Duddie Ford, Inc.*, *supra* (false data on loan applications). The defendant's argument thus finds no support in our corporate liability jurisprudence. Legislative intent likewise does not support the defendant's reasoning: by including corporations within the general statutory definition of "person," the Legislature evinced a general intent to hold corporations legally account-

able for their actions.[11] Because no intention to exclude corporations from the definition of "persons" or "whoever" appears in G. L. c. 90, we conclude that a corporation may be criminally liable for violation of G. L. c. 90, § 24G (*b*), in accordance with the principles of corporate criminal liability explicated in *Commonwealth* v. *Beneficial Fin. Co.*, *supra*, and *Commonwealth* v. *L.A.L. Corp.*, *supra*.[12]

The defendant further contends that it cannot be found vicariously liable for the victim's death because corporate criminal liability requires criminal conduct by the agent, which is lacking in this case. Operating a truck without a back-up alarm, the defendant notes, is not a criminal act: no State or Federal statute requires that a vehicle be equipped with such a device. Although the defendant is correct that criminal conduct of an agent is necessary before criminal liability may be imputed to the corporation, it mischaracterizes the agent's conduct in this case. Gauthier's criminal act, and the conduct imputed to the defendant, was not simply backing up without an alarm, as the defendant contends; rather, the criminal conduct was Gauthier's negligent operation of the defendant's truck, resulting in the victim's death, in violation of G. L. c. 90, § 24G (*b*). Clearly, a corporation cannot be criminally liable for acts of employee negligence that are not criminal; however, G. L. c. 90, § 24G (*b*), criminalizes negligence in a very specific context (the operation of a motor vehicle on a public way) and with a specific outcome (resulting in death). Furthermore, nothing in that statute requires that the negligence be based on a statutory violation; the fact that a back-up alarm is not required by statute, then, is irrelevant to the issue whether vehicular homicide committed by an employee can be imputed to the corporation. Cf. *Akron* v. *Redman*, 70 Ohio Misc. 33, 36 (1981) ("vehicular homicide now includes negligence in general and is not limited

[11]General Laws c. 4, § 7, Twenty-third, provides: "In construing statutes the following words shall have the meanings herein given, unless a contrary intention clearly appears . . . '[p]erson' or 'whoever' shall include corporations, societies, associations and partnerships."

[12]Other States to consider this issue also have concluded that a corporation may be criminally liable for negligent vehicular homicide under their statutes. See, e.g., *Commonwealth* v. *McIlwain Sch. Bus Lines, Inc.*, 283 Pa. Super. 1, 14-15 (1980); *State* v. *Richard Knutson, Inc.*, 196 Wis. 2d 86 (Ct. App. 1995).

to violations of particular laws relating to traffic"). If a corporate employee violates G. L. c. 90, § 24G (*b*), while engaged in corporate business that the employee has been authorized to conduct, we can see no reason why the corporation cannot be vicariously liable for the crime.

4. *Sufficiency of evidence of negligence.* Applying the standards of corporate criminal liability described above, the Commonwealth first must prove that the defendant's employee or agent committed the criminal act with which the corporation was charged. Here, that criminal act is homicide by motor vehicle, as defined in G. L. c. 90, § 24G (*b*). The elements necessary to find criminal culpability for vehicular homicide under this statute are "(1) operation of a motor vehicle, (2) upon a public way, (3) recklessly or negligently so as to endanger human life or safety, (4) thereby causing the death of a person." *Commonwealth* v. *Burke*, 6 Mass. App. Ct. 697, 699 (1978). Thus, for the defendant to be liable, the Commonwealth must prove that Gauthier, the defendant's driver, operated the truck negligently.

"A finding of ordinary negligence suffices" to establish homicide by motor vehicle in violation of G. L. c. 90, § 24G (*b*). *Commonwealth* v. *Jones*, 382 Mass. 387, 389 (1981). *Commonwealth* v. *Diaz*, 19 Mass. App. Ct. 29, 36 (1984). "Negligence . . . in its ordinary sense, is the failure of a responsible person, either by omission or by action, to exercise that degree of care, vigilance and forethought which . . . the person of ordinary caution and prudence ought to exercise under the particular circumstances." *Beaver* v. *Costin*, 352 Mass. 624, 626 (1967), quoting *Altman* v. *Aronson*, 231 Mass. 588, 591 (1919). The operator of a motor vehicle has a duty to exercise ordinary care for the safety of others while operating the vehicle. *Catanese* v. *MacEntee*, 333 Mass. 132 (1955) (pedestrian and motorist). See R.J. Kenney, Jr., & T.J. Farris, Motor Vehicle Law and Practice § 1.2, at 3 (3d ed. 1998). "[T]he amount of care that the prudent person would exercise varies with the circumstances, the care increasing with the likelihood and severity of the harm threatened." *Goldstein* v. *Gontarz*, 364 Mass. 800, 805 (1974).

Bearing in mind that "juries are uniquely qualified to apply

the reasonable person standard," *O'Connor* v. *SmithKline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363 (1994), we must determine whether a reasonable jury could have found that Gauthier failed to use ordinary care in backing up the defendant's truck at the work site. The defendant argues, and the Appeals Court concluded, that there was insufficient evidence of Gauthier's negligence because he did everything that a reasonably prudent person would have done in the circumstances: he told the victim that he was about to back up, rolled down his window, checked his mirrors, turned off his radios, and operated the truck very slowly. *Commonwealth* v. *Angelo Todesca Corp.*, 62 Mass. App. Ct. 599, 607-608 (2004).

However, a reasonable jury could have found that Gauthier was negligent based on other evidence adduced at trial. It was undisputed that Gauthier's truck was not equipped with a functioning back-up alarm at the time of the collision, and that he knew the alarm was missing.[13] Although a back-up alarm was not required by statute, the defendant had a written safety policy mandating that all its trucks be equipped with such alarms. See note 4, *supra*. An employee's violation of his employer's rules, intended to protect the safety of third persons, is evidence of the employee's negligence, for which the employer may be held liable. See *Clough* v. *New England Tel. & Tel. Co.*, 342 Mass. 31, 37 (1961), quoting *Stevens* v. *Boston Elevated Ry.*, 184 Mass. 476, 478 (1904). Furthermore, evidence of custom or practice, even when not embodied in a written policy, also may be considered in determining whether conduct was negligent: "it may be evidence of a defendant's negligence, also, that he failed to follow his usual practice or habit in operating his vehicle, that the plaintiff knew of such custom, relied upon it, and suffered injury as a result." R.J. Kenney, Jr., & T.J.

---

[13]The defendant contends that the lack of a back-up alarm is irrelevant under G. L. c. 90, § 24G (*b*), because the statute regulates only the manner in which a vehicle is operated, and not the vehicle's condition or lack of safety equipment. To the extent that the absence of the back-up alarm is not a violation of a statute or regulation that would constitute evidence of negligence, this case was not tried on that theory. Here, evidence of the defendant's custom of using trucks with back-up alarms at its work sites, and its published safety policy requiring that all trucks have these alarms at all times, were relevant in evaluating whether Gauthier's operation of his vehicle was negligent.

Farris, Motor Vehicle Law and Practice, *supra* at § 2.13, at 59. See *Kelly* v. *Boston & Me. R.R.*, 319 Mass. 603, 607-609 (1946) (testimony relating to "custom or practice" in delivery of railroad cars properly admitted in trial of railroad for negligence); *Hanley* v. *Boston & Me. R.R.*, 286 Mass. 390, 398-399 (1934), cert. denied, 293 U.S. 597 (1934) (evidence of defendant's "general custom" of warning of approaching train with series of short whistle blasts properly admitted on issue of defendant's negligence); Restatement (Third) of Torts § 13(b) & comment f (Proposed Final Draft 2005) ("An actor's departure from the custom of the community, or of others in like circumstances, in a way that increases risk is evidence of the actor's negligence but does not require a finding of negligence").

Here, Gauthier operated the truck without a back-up alarm, in clear violation of the defendant's own safety policy. The Commonwealth also presented evidence that the defendant's customary practice was to install back-up alarms on its trucks. Other drivers at the work site had functioning back-up alarms, and although they spoke moments before the collision, Gauthier never informed the victim that his truck did not have an alarm. The jury, then, could have inferred that the victim, a veteran police officer, was aware that the defendant's custom was to equip its trucks with back-up alarms, and that the victim expected to hear a back-up alarm when a driver operated a truck in reverse. Thus, whether framed as Gauthier's failure to adhere to his employer's safety rules, or as his departure from a customary practice relied on by the victim, the result is the same: the jury reasonably could have concluded, on either theory, that Gauthier was negligent in operating the defendant's truck without a back-up alarm.[14]

Because simple negligence, determined by the same standard

--------

[14]The dissent contends that the evidence was insufficient because there was no evidence that the defendant's custom "was to utilize only trucks with working [back-up] alarms." *Post* at 150. The point is appropriate for closing argument, but we are obliged by *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), to view the evidence in the light most favorable to the Commonwealth. Here, there was evidence that the defendant installed back-up alarms on all its trucks, and that it required these alarms to protect people behind the vehicles. Gauthier was aware of this policy because the truck as-

employed in tort law, suffices for a conviction of vehicular homicide under G. L. c. 90, § 24G (*b*), other evidence before the jury also could have supported a finding of negligence by Gauthier.[15] *Commonwealth* v. *Jones*, 382 Mass. 387, 389 (1981); *Commonwealth* v. *Burke*, 6 Mass. App. Ct. 697, 699-701 (1978). For example, the jury may have concluded that reasonable care would have required Gauthier to sound his city horn before backing up, as he did earlier that day; or that Gauthier, aware that the victim was behind him and that his truck has a blind spot, should have located the officer, clad in a bright orange raincoat, in his mirror before backing up again; or that Gauthier should have stopped his truck as soon as he heard other drivers' air horns sounding.

5. *Sufficiency of evidence of causation.* The Appeals Court held that the Commonwealth presented insufficient evidence of causation, reasoning that there was "no evidence that a back-up alarm would have changed the result, and thus no evidence of a causal nexus." *Commonwealth* v. *Angelo Todesca Corp.*, *supra* at 608. The defendant claims that the Appeals Court properly determined that the victim would not have heard a back-up

---

signed to him by the defendant always had a back-up alarm (except at the time of this incident), and he filed a daily report noting the absence of the alarm on his truck.

Contrary to the dissent's further assertion that there was no evidence that the victim knew of, and relied on, the custom, *post* at 151, the jury reasonably could have inferred this from the concerns both Gauthier and other drivers had about the absence of a back-up alarm from Gauthier's truck. Testimony that another truck, farther away from the victim but backing up at the same time as Gauthier, did have a functioning alarm, which sounded as its driver backed toward the paver, also could support an inference that the victim would have expected Gauthier's truck to have a similar alarm. (As discussed in greater detail, *infra* at 141, a back-up alarm sounding on another truck may not have provided sufficient warning to the victim about the location of Gauthier's vehicle.) In addition, at least two other drivers, employed by the defendant and working on the repaving project, testified that on the day of the collision, their trucks were equipped with functional back-up alarms, which would have sounded when they delivered asphalt to the paver. The jury could have relied as well on their common experience that large trucks can be expected to have such alarms, and they could have inferred that the defendant installed these alarms precisely because people have come to expect them.

[15]Of course, in a prosecution for motor vehicle homicide, unlike in tort law, the Commonwealth is held to a heightened burden of proof, and the comparative negligence statute, G. L. c. 231, § 85, does not apply. See *Commonwealth* v. *Galluzzo*, 25 Mass. App. Ct. 568, 571-572 (1988).

alarm on Gauthier's truck because he did not respond to air horns sounded by other drivers or the back-up alarm of the truck behind Gauthier. *Id.* The Commonwealth, however, argues that air horns could not substitute for the distinctive sound of a back-up alarm, and that a reasonable jury could have determined that the victim would have reacted differently had the defendant's truck been equipped with such an alarm.

"[T]he appropriate standard of causation to be applied in a negligent vehicular homicide case under § 24G is that employed in tort law." *Commonwealth* v. *Berggren*, 398 Mass. 338, 340 (1986). "Whether negligent conduct is the proximate cause of an injury depends . . . on whether the injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." *Kent* v. *Commonwealth*, 437 Mass. 312, 320 (2002). Such conduct may be a proximate cause of death "if, 'in the natural and continuous sequence,' it produces the death, and the death would not have occurred in its absence." *Commonwealth* v. *Osachuk*, 43 Mass. App. Ct. 71, 73 (1997), quoting *Commonwealth* v. *Rhoades*, 379 Mass. 810, 825 (1980). "Subject to those comparatively rare situations when a court is able to draw the outer limits, questions of proximate cause are in the province of the jury." *Hopping* v. *Whirlaway, Inc.*, 37 Mass. App. Ct. 121, 125 (1994).

Here, a reasonable jury could have found that the truck's collision with the victim, and the victim's ensuing death, was a foreseeable result of Gauthier's operating the defendant's truck in reverse without the customary back-up alarm, and without informing the victim that the alarm was missing. We do not agree with the Appeals Court's conclusion that the fact that the victim did not move out of the truck's path means that he did not hear the back-up alarm on the other truck, and therefore would not have heard a back-up alarm on Gauthier's truck: the jury may have concluded that the victim did hear the back-up alarm on the other truck, but that he reasonably believed that vehicle to be a safe distance away. The jury also could have inferred, based on testimony concerning the location of a back-up alarm on the vehicle, that an alarm on Gauthier's truck would have sounded practically in the victim's ear, alerting him to the truck's movement in time to get out of its way. In addi-

tion, the jury could have inferred, based on testimony as well as on their life experiences and common sense, that the back-up alarm makes a distinctive beeping sound, intended to warn people behind the vehicle that it is operating in reverse, and that the victim did not realize Gauthier's truck was backing up because he did not hear that sound. Despite their volume, air horns sounded by nearby drivers would not substitute for the unique sound of a back-up alarm on Gauthier's truck. In fact, Gauthier heard the air horns of the other trucks but did not know why they were sounding. Thus, there was sufficient evidence from which the jury could have found that Gauthier's negligence caused the accident resulting in the victim's death.

The defendant also claims that it cannot be liable for vehicular homicide because the victim's negligence was the sole cause of his death. "In criminal cases, as opposed to civil negligence suits, a victim's contributory negligence, even if it constitutes a substantial part of proximate cause (but not the sole cause), does not excuse a defendant whose conduct also causes the death of another." *Commonwealth* v. *Campbell*, 394 Mass. 77, 87 (1985). While the defendant is correct that it cannot be liable if the victim's conduct was the sole cause of the accident, it was for the jury to determine whether, and to what extent, the victim's conduct may have contributed to the collision. Both sides argued this issue extensively at trial, and because the jury were properly instructed on causation, they must have determined that Gauthier's negligence was a substantial cause of the collision, even if the victim's conduct also was a factor. See *Lawrence Sav. Bank* v. *Levenson*, 59 Mass. App. Ct. 699, 707 (2003) ("question of causation is generally one of fact for the jury"). Thus, the defendant's claim that the victim was the sole cause of the collision fails.

6. *Sufficiency of evidence of operation on a public way.* "[I]t is essential that a vehicular homicide occur 'upon a way or in a place to which members of the public have access.' " *Commonwealth* v. *Geisler*, 14 Mass. App. Ct. 268, 276 (1982), quoting *Commonwealth* v. *Jones, supra* at 393. The definition of "[w]ay" in G. L. c. 90, § 1, includes "any public highway."[16] Clearly, Route 28, in normal circumstances, is a public "way"

---

[16]The relevant portion of G. L. c. 90, § 1, defines "[w]ay" as "any public

for the purposes of the vehicular homicide statute. However, the issue before us is whether the jury reasonably could have found that the section of the highway on which the collision occurred was open to the public. "[I]t is the objective appearance of the way that is determinative of its status . . . . It is sufficient if 'the physical circumstances of the way are such that members of the public may reasonably conclude that it is open for travel to invitees or licensees.' " *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. 545, 549 (1996), quoting *Commonwealth* v. *Hart*, 26 Mass. App. Ct. 235, 237-238 (1988). The defendant claims that the portion of the road on which Gauthier's truck struck the victim was closed to the public, based on the testimony of a highway engineer and another witness regarding the placement of traffic cones. The Commonwealth, however, argues that the road was open because the public could cross it to gain access to the shopping mall.

We agree with the Commonwealth. Although sections of the highway were closed during roadway paving, at least one lane remained open to traffic. The jury heard conflicting testimony about the location of cones on the highway, and jurors may have credited the testimony of those witnesses who stated that no cones had been placed near the mall entrance. Furthermore, the mall was open for business, and the victim's responsibility was to direct traffic in and out of the mall parking lot, across the work site. In fact, a witness testified that a car leaving the mall cut across Gauthier's path moments before the collision. The jury thus could have determined that the road was accessible to members of the public who wished to visit the mall, satisfying the public way element of the vehicular homicide statute.

7. *Conclusion.* For the foregoing reasons, we conclude that the evidence was sufficient to support the conviction.

*Judgment affirmed.*

CORDY, J. (dissenting, with whom Marshall, C.J., and Cowin,

highway, private way laid out under authority of statute, way dedicated to public use, or way under the control of park commissioners or body having like powers."

J., join). Officer Erickson's death was the result of a horrible and regrettable accident. However, "the mere happening of [an] accident [does] not warrant a finding of negligence." *Zarrillo* v. *Stone*, 317 Mass. 510, 512 (1945). I agree with the Appeals Court that the evidence at the criminal trial was insufficient to establish that Brian Gauthier operated his truck negligently, in violation of the motor vehicle homicide statute, thereby causing the officer's death.[1] See *Commonwealth* v. *Angelo Todesca Corp.*, 62 Mass. App. Ct. 599, 607-608 (2004). There was no evidence that the truck could not be operated safely without a back-up alarm, or that Gauthier did anything less than what ordinary prudence would require in the circumstances when he backed up.[2] While the absence of a functioning back-up alarm on Gauthier's truck may be relevant to the question of its negligent operation, it clearly is not sufficient to establish such negligence on the instant facts. Because the court essentially concludes otherwise, I respectfully dissent.

All of the evidence at the trial (other than the absence of a back-up alarm) was consistent with the careful and prudent operation by Gauthier of his truck.[3] Minutes before the accident, Gauthier and the drivers of two other trucks waiting to unload their asphalt spoke to the officer about the order in which they would back up. Gauthier pointed out his truck and told the officer that he was going to be next. During the same conversation the officer agreed (as was his responsibility at the

---

[1] I also agree with this court's analysis regarding corporate criminal liability, and its conclusion that the defendant corporation can be held vicariously liable for violating the motor vehicle homicide statute, G. L. c. 90, § 24G (*b*), if Brian Gauthier operated its truck negligently. See *ante* at 136-137. I view this issue as entirely separate from whether the defendant corporation may be liable civilly for its own negligence in not replacing the back-up alarm on Gauthier's truck.

[2] I do not contend (as the Appeals Court held) that the evidence was insufficient for a jury to find the lack of a functioning back-up alarm proximately caused the accident. Contrast *Commonwealth* v *Angelo Todesca Corp.*, 62 Mass. App Ct. 599, 608-609 (2004).

[3] Gauthier's conduct was also consistent with the careful maintenance of the defendant's truck that he drove. He promptly informed the defendant's mechanic of the loss of the back-up alarm, requested a replacement, and noted the absence of a back-up alarm each day on the daily inspection reports, which were submitted to his employer.

intersection where he was stationed)[4] "to watch [their] backs"[5] as they backed up to ensure that vehicles and pedestrians stayed clear. The drivers then walked to their respective trucks to begin backing toward the paver. Right before entering the cab to his truck, Gauthier climbed up on its back frame to remove the tarp from the asphalt. He looked to see whether anyone was close to his truck. No one was. As he got into the cab of his truck, he saw the officer walking near the center yellow lines of the street away from his truck in the direction of the paver (which was approximately 1,600 feet away) at a distance too far to talk to him. This was not a position of danger. After entering the cab, Gauthier turned off both his "[m]usic radio and the CB," opened a window, and began to back up at what was described by all of the witnesses as an exceedingly slow speed of from two to three miles per hour.[6] Gauthier used his mirrors to look behind him as he backed up, and stopped for a car that crossed behind him going either into or out of the mall entrance. In backing up, Gauthier kept his truck a vehicle's width from the center line, where he had last seen the officer. Finally, after proceeding approximately 150 feet, two other truck drivers began to sound their air horns. Gauthier looked again at both side mirrors: first at the passenger side where he had been moving past parked trucks, thinking he might have clipped his mirror on another truck; and then out the driver's side where he saw the officer on the ground partially under his truck. He stopped the truck immediately. Unfortunately, it was too late.

Witnesses to the accident testified that at some point while

[4]According to the testimony at trial, Officer Erickson was one of a number of officers working at the construction project as part of a paid detail. He had been on the job for approximately nine hours at the time of the accident. He was assigned to work at the entrance to the Bell Tower Mall that was located in the section of the highway that was to be paved that day. His responsibilities included ensuring that pedestrians and vehicles could safely get in and out of the mall, and that they did not get in the way of the trucks delivering asphalt to the site.

[5]The truck driver who asked the officer to "watch [their] backs" testified that the time between this conversation and Gauthier's starting his truck was twenty seconds, although the jury could have found that the interval may have been a bit longer.

[6]One witness described the truck as "creeping along," another as going as slow as it could go without stalling, and Gauthier testified that he could "crawl as fast as the truck was going."

the truck was backing up, the officer began to cross behind it diagonally from the passenger side, with his back to it. He proceeded to walk directly into the truck's blind spot. As he walked, the officer was looking at and doing something with the gloves on his hands. He was wearing a winter-type hat that was pulled down over his ears. When the truck air horns began to blare, he did not take any notice, and kept walking behind the truck into its blind spot. Within seconds, Gauthier's truck overtook the officer, knocking him to the ground. Realizing what was happening, the officer rolled toward the driver's side to get out of the way, but his legs went under the wheels and were pinned. When help arrived at the scene, the officer was conscious. When asked by a paramedic what happened, he "made some . . . statement that he had really screwed up."

General Laws c. 90, § 24G (b), penalizes a person who "operates a motor vehicle . . . negligently so that the lives or safety of the public might be endangered" and thereby causes death. To sustain a conviction, there must be, inter alia, sufficient evidence for a rational jury to conclude beyond a reasonable doubt that Gauthier failed to act as "a person of ordinary prudence would act in the circumstances." *Goldstein* v. *Gontarz*, 364 Mass. 800, 805 (1974). Notwithstanding a presumption in our case law that questions of negligence will be resolved by a jury, Massachusetts courts have on numerous occasions concluded that evidence of negligence was insufficient for a jury to hold a civil defendant liable or a criminal defendant culpable. See, e.g., *Aucella* v. *Commonwealth*, 406 Mass. 415 (1990); *Cunningham* v. *Thurman Transp., Inc.*, 358 Mass. 824 (1971); *Parsons* v. *Ryan*, 340 Mass. 245 (1960); *Callahan* v. *Lach*, 338 Mass. 233 (1958); *Cioffi* v. *Lowell*, 316 Mass. 256 (1944); *Burke* v. *Durland*, 312 Mass. 291 (1942); *O'Reilly* v. *Sherman*, 298 Mass. 571 (1937).

It is, of course, true that some defects in a vehicle could, in and of themselves, make the vehicle so unsafe that operating it would be negligent without regard to other factors. Seriously defective brakes or steering mechanisms would be prime examples of such defects. It is axiomatic that to be driven safely a vehicle needs to be able to be stopped and steered. See, e.g., *Elfeld* v. *Burkham Auto Renting Co.*, 299 N.Y. 336, 344 (1949)

(negligent to drive vehicle with defective steering mechanism and rear tires). Vehicle safety laws and regulations require that such mechanisms be present and be in good working order. It is not surprising that operating a vehicle in almost any circumstances knowing that such parts were so defective would be sufficient to support a finding of negligence.[7]

With regard to back-up alarms, however, there is no Federal or State law that requires trucks of the type driven here to be equipped with them,[8] or to utilize them when operated on construction sites of this nature.[9] Cf. *Madden* v. *Berman*, 324 Mass. 699, 702 (1949) (violation of statute requiring red taillight "would be evidence of negligence on the part of the defendant"). The parties have cited no case from any jurisdiction, and I have found none, in which any court has held or suggested that a truck driver negligently operates his vehicle simply by backing up without a working back-up alarm. Unlike defective brakes, tires, or steering mechanisms, the lack of a working back-up alarm does not inherently affect the ability to drive a truck in a nonnegligent manner. There was no evidence adduced at trial to the contrary.

Recognizing this problem of proof, the court primarily rests its affirmance of the jury verdict on the observations that, in certain circumstances, an employee's violation of his employer's safety policy or the failure to operate a vehicle in conformity with one's usual habit or custom can constitute negligence even where the defendant (and employer) had no independent obligation to adopt the policy or the custom in the first place. See

[7]There was evidence that the front brakes on Gauthier's truck pulled to one side when they were applied, but it was not contended that this had anything to do with the accident.

[8]Contrast G. L. c. 90, § 7 (commercial vehicles used to deliver gasoline or other flammable material "shall be equipped with an audible warning system when the vehicle's transmission is in reverse").

[9]As the Appeals Court notes, neither the Commonwealth nor the United States Department of Transportation requires a back-up alarm on the type of truck at issue here. An Occupational Safety and Health Administration regulation, which does not apply to trucks operating at work sites such as the site in the instant case, requires trucks either to have a back-up alarm or to back up only when an observer signals it is safe to do so. The regulation was not in evidence. See *Commonwealth* v. *Angelo Todesca Corp.*, 62 Mass. App. Ct. 599, 604-605 & n.8 (2004).

*ante* at 138-139. These theories of negligence liability, while perhaps applicable in other circumstances, fail here.

First, even were I persuaded that a violation of the defendant corporation's safety policy might be sufficient, on its own, to support the jury's verdict, which I am not, see *Stevens* v. *Boston Elevated Ry.*, 184 Mass. 476, 479 (1904) (evidence of violation of employer's safety rules is "not conclusive" of defendant's negligence), the court misconstrues the safety policy in question. While it is correct that the defendant's safety manual states that "[a]ll vehicles are to be equipped with back up alarms," the court overlooks the evidence as to how that policy operated with regard to defective, broken, or missing parts on the defendant's trucks. This is particularly important given the undisputed evidence that it is not uncommon for the back-up alarms with which the defendant's trucks are equipped to break off or otherwise be damaged.

The evidence was that the defendant's truck drivers are required to conduct a daily safety inspection of their respective trucks. Based on this inspection, the drivers fill out an inspection form, noting any problems found. This form is submitted to the defendant company and to its mechanic. Gauthier noted the absence of a functioning back-up alarm on each inspection report he filed at least a couple of weeks and perhaps for "a couple of months" prior to the accident.[10] He personally informed the company mechanic of the problem weeks before the accident and, at that time, requested a new back-up alarm. However, neither the mechanic nor any other company official took any action to remove Gauthier's truck from operation. No one suggested to Gauthier that he should not drive the truck until it was outfitted with a new alarm.[11] This is not surprising, as the testimony at trial was that neither the mechanic nor others affiliated with the defendant had ever heard of a truck being

[10]Although the inspection form expressly lists a number of essential truck parts, it does not require information about a back-up alarm. Gauthier, however, consistently handwrote that his truck lacked a back-up alarm.

[11]Evidence adduced at trial showed that either the defendant's vice-president of operations of construction, its mechanics, or a truck driver could decide to take the truck out of service for safety reasons.

removed from operation because of a missing or broken back-up alarm.[12]

Gauthier did what the defendant required him to do to address the absence of a back-up alarm on his truck. Where Gauthier adequately and continuously notified the defendant of the absence of a back-up alarm, and where the defendant, in conformity with its normal conduct of business, allowed the vehicle to be used despite this problem, it would be odd to consider Gauthier's operation of his truck to be in violation of the defendant's rules and, therefore, evidence of his negligence.[13]

As for grounding liability on a person's failure to operate a vehicle in conformity with his usual habit or custom, it is difficult to conceptualize how this theory even applies to the issue of vehicular homicide in this case. It is Gauthier's operation of the truck that is at issue on that charge, not the conduct of the defendant corporation. It was not Gauthier's practice to drive vehicles with back-up alarms to this site — the evidence is exactly to the contrary — and the accident occurred during his third trip to the site that day without a back-up alarm. The fact that Gauthier's truck did not have an alarm and that he was

---

[12]Additional testimony revealed that the company also sanctioned the operation of trucks that were awaiting repairs on other parts, including those referenced in the section of the safety manual quoted by the court. See note 7, *supra*. See also *ante* at 129 n.4. For example, Gauthier was allowed to drive his truck for "a couple of weeks, a month maybe," while the mechanic awaited parts necessary to fix a reported cracked manifold on the truck.

[13]*Stevens* v. *Boston Elevated Ry.*, 184 Mass. 476, 478 (1904), established that an employee's violation of the defendant employer's safety rules, adopted for the protection of a third party, can be admitted "in evidence as tending to show negligence of the defendant's disobedient servant for which the defendant is liable." However, it did so because "[a]gainst the proprietor of a business, the methods which he adopts for the protection of others are some evidence of what he thinks necessary or proper to insure their safety." *Id.* at 480. In addition to the general problem with this analysis — that the negligence standard is an objective, not subjective, one — it clearly does not apply to this case. Notwithstanding the safety manual, the defendant did not consider the lack of a functioning back-up alarm to be an emergency issue, requiring the immediate removal of a truck from operation. Rather, its policy was to repair such a problem as soon as practicable. Although this might suggest that the defendant believed operating with a back-up alarm is safer than operating without one, it does not suggest that the defendant believed the latter conduct to be unsafe. Cf. *Towne* v. *Waltham Watch Co.*, 247 Mass. 390, 394 (1924) (*Stevens* case inapplicable where defendant did not violate duty to comply with employer's order to keep steps and platform clean).

aware that other trucks delivering asphalt to the site may have had them seems at most to be just one of the circumstances bearing on how an ordinarily prudent person in Gauthier's position would act, not a separate basis on which to attach liability.

Assuming, arguendo, that this theory has some relevance, the evidence fails to support it. Although there was testimony that it was the defendant corporation's practice to install back-up alarms on each of its trucks and that some of the trucks at the work site had functioning alarms, there was no evidence that its custom was to utilize only trucks with working alarms. Cf. *Kelly* v. *Boston & Me. R.R.,* 319 Mass. 603, 607-609 (1946) (specific evidence of employees' custom "nearly every other day"). To the contrary, and as noted above: despite Gauthier's having noted the absence of a functioning back-up alarm daily for at least two weeks prior to the accident, Gauthier was permitted to continue using the truck during that time period; and the undisputed testimony was that the defendant corporation had never pulled a truck off the road because of a malfunctioning back-up alarm, even though damage to such mechanisms was common.

More problematic, a defendant's habit or custom is only relevant to the negligence inquiry if it is known to and relied on by the injured party. R.J. Kenney, Jr., & T.J. Farris, Motor Vehicle Law and Practice § 2.13, at 59 (3d ed. 1998).[14] Cf. *Flaherty* v. *New York Cent. & Hudson River R.R.,* 211 Mass. 570, 572 (1912). There was no evidence here of knowledge or reliance. There was no evidence that all of the trucks working at the site except Gauthier's had back-up alarms.[15] At best, there was evidence from which the jury could infer that that the officer knew that some of the trucks delivering asphalt had back-up alarms. Gauthier, however, had made two previous

[14]The use of a person's custom or habit is a narrow exception to the general rule that "[a] party's habitual or customary conduct of its activities has ordinarily no probative force as to whether its conduct on a particular occasion was negligent, since its habitual conduct is no measure of reasonable care." R.J. Kenney, Jr., & T.J. Farris, Motor Vehicle Law and Practice § 2.13, at 57 (3d ed. 1998).

[15]The defendant corporation was a subcontractor on the road improvement project. It did not own or operate all of the trucks delivering asphalt to the site.

deliveries to the work site that very day without a back-up alarm sounding.[16] A jury could not permissibly infer from this dearth of evidence that the officer knew that it was the custom of the defendant corporation (or Gauthier) to use only trucks with functioning back-up alarms to deliver asphalt to this site, *and* that he was relying on that custom when the accident occurred.[17] To reach such a conclusion, the jury would have had to pile "inference upon inference or conjecture and speculation" in a way that our case law prohibits. *Commonwealth* v. *Armand*, 411 Mass. 167, 170 (1991). See *Corson* v. *Commonwealth*, 428 Mass. 193, 197 (1998), quoting *Commonwealth* v. *Rhoades*, 379 Mass. 810, 817 (1980) (evidence insufficient "if it tends 'equally to support either of two inconsistent propositions' ").

As an afterthought, the court's opinion notes that, even if the absence of a functioning back-up alarm was not dispositive of negligence, "the jury may have concluded that reasonable care would have required Gauthier to sound his city horn before backing up . . . or that Gauthier, aware that the victim was behind him and that his truck has a blind spot, should have located the officer . . . in his mirror before backing up again; or that Gauthier should have stopped his truck as soon as he heard other drivers' air horns sounding." *Ante* at 140.

In retrospect, after any accident, there will always be things that, had they been done differently, might have made a difference. That, however, is not the standard for negligence. See *Zarrillo* v. *Stone*, 317 Mass. 510, 512 (1945). Rather, there must be evidence that the defendant exercised a level of care below the level that an ordinarily prudent person would exercise in the same circumstances. See *Goldstein* v. *Gontarz*, 364 Mass. 800, 805-806 (1974). Assuming that an ordinarily prudent person would have exercised a heightened level of care due to

[16]During his first delivery to the site, Gauthier sounded his "city horn" when he backed up. He testified that he did so because there were many people around his truck when it was his turn to back up, and the path to the paver was "tight." Those circumstances were not present at the second or the final drop off.

[17]Evidence that the officer had worked details at other similar work sites is of no probative weight without evidence as to whether any, some, or all of the trucks at those sites had functioning back-up alarms.

the absence of a working back-up alarm, see *id.* ("backing of a vehicle is not among the few situations which invariably demand heightened or 'extreme' care on the part of the man of ordinary prudence," but "circumstances here . . . happened in fact to call for heightened . . . care"), the undisputed evidence was that Gauthier took extra precautions to ensure the safe operation of his vehicle at the work site. Cf. *Burnett* v. *Conner*, 299 Mass. 604, 607 (1938) (defendant negligent where vehicle rolled down hill because she knew of defective emergency brake and because "she knew how to secure the automobile from starting if the emergency brake became released"). He warned the officer that he was about to back up next, observed that neither the officer nor anyone else was near the back of the truck before he entered the cab, turned off his radios, rolled down his windows, used both side mirrors, and proceeded to back his truck up at a very slow rate of speed for 150 feet before the officer inadvertently crossed behind and into the blind spot.

While it might have added something if Gauthier had honked his "city horn" before backing up, this extra warning was not necessary to meet the prudent person standard in these circumstances.[18] Cf. *Cioffi* v. *Lowell*, 316 Mass. 256, 258 (1944) (running over child moments after starting motor vehicle not negligent in part because "warning that the defendant was about to start . . . would [not] have afforded the plaintiff any information not already made evident"); *Burke* v. *Durland*, 312 Mass. 291, 292-293 (1942) (evidence of negligence insufficient because, "[w]hen [defendant] started the truck, he . . . had no reason to suppose that [anyone] remained in a place of danger"); *Tenney* v. *Reed*, 262 Mass. 335, 338 (1928) (grounding negligence in part on fact that "no horn was sounded or other warning given . . . before the truck was started"). An ordinarily prudent person would have considered the advance warning given to the officer, who was neither a bystander nor (as is often the case) a child, enough to proceed without the fear of hitting him.

When Gauthier saw the officer in a position of relative safety

---

[18]The evidence was uncontested that the officer did not react to the air horns (which are much louder than a truck's "city horn") of the two other trucks that attempted to alert him that he was walking into the blind spot of Gauthier's truck.

before entering his truck, it was not unreasonable for him to begin and continue backing up (albeit very slowly) although unable to see the officer in his mirrors. This is particularly so considering that the officer — moments before and in conformity with his job duties — had agreed to watch the trucks as they backed up, and that Gauthier's truck stayed a safe distance from the last spot (the road centerline) where the officer had been seen. See *Cioffi* v. *Lowell, supra* at 258 ("When the defendant saw the plaintiff [child], she was in a position of safety. There was no evidence that she was then running about, so that she was likely immediately to place herself in a position of danger. . . . The relative positions of the automobile and of the plaintiff may have been such that the defendant could not see the plaintiff while he was starting his automobile. It is often difficult, if not impossible, to avoid some interval between the last sight of [a pedestrian] . . . and the starting of an automobile. It is not shown that 'further attention' by the defendant toward the plaintiff would have avoided the accident"); *Callahan* v. *Lach*, 338 Mass. 233, 234-235 (1958) (truck hitting child insufficient to establish negligence where child was warned to stay away because "defendant had no reason in the circumstances to suppose that the plaintiff was in a place of danger or likely to move into a place of danger either when he started his vehicle or immediately prior to the accident"). Cf. *Capano* v. *Melchionno*, 297 Mass. 1, 7-8 (1937) (although "question is somewhat close," sufficient evidence of negligence where defendant did not take extra precautions after "seeing the little hands on the tailboard of his truck" indicating that "a child was dangerously near").[19] In these circumstances, Gauthier had no reason to suspect that the officer might blindly walk behind his truck as it continued to back up toward the paver.

Notwithstanding the court's claim, a rational jury could not find that Gauthier did other than what an ordinarily prudent

---

[19]Obviously, more caution is required by an ordinarily prudent person when operating a vehicle around children than when doing so around adults. Likewise, an ordinarily prudent person would exercise more care when operating a vehicle in relation to civilians than in relation to an officer whose job duties included watching the trucks reverse toward the paver. The instant case provides circumstances more favorable to the defendant than any of these three cases.

person in his situation would be required to do. As tragic as this accident was, the evidence in the instant case is, in my opinion, insufficient to find Gauthier (and hence the defendant corporation) guilty of vehicular homicide, even given the absence of a functioning back-up alarm on his truck. Because the defendant's motion for a directed verdict should have been allowed, I respectfully dissent.[20]

---

[20]That Gauthier "admitted to sufficient facts" on a vehicular homicide charge and received a "continued without finding" disposition does not relieve the Commonwealth from proving each element of the crime with which the defendant is charged, beyond a reasonable doubt. *Commonwealth* v. *Angelo Todesca Corp.*, 62 Mass. App. Ct. 599, 605 n.9 (2004), quoting *Wardell* v. *Director of the Div. of Employment Sec.*, 397 Mass. 433, 436-437 (1986) ("An admission to sufficient facts, absent a subsequent finding of guilt, does not constitute substantial evidence from which a finder of fact . . . can determine that the alleged misconduct has indeed occurred").